FERNANDO FRILLICI ET AL. *v.* TOWN OF
WESTPORT ET AL.
(14972)

PETERS, C. J., and CALLAHAN, BORDEN, NORCOTT and PALMER, Js.

Argued September 21—decision released December 6, 1994

*Lawrence J. Merly,* with whom was *Joseph Merly,* for the appellants (plaintiffs).

*G. Kenneth Bernhard,* with whom was *Gregory C. Hammonds,* for the appellees (named defendant et al.).

*Richard F. Webb,* assistant attorney general, with whom, on the brief, were *Richard Blumenthal,* attorney general, and *Joseph Rubin,* assistant attorney general, for the appellee (defendant state).

BORDEN, J. The dispositive issue in this appeal is whether regulation of shellfish beds in the area off the shore of the town of Westport known as Cockenoe Flats is under the jurisdiction of the town of Westport and the town's shellfish commission or under the jurisdiction of the state of Connecticut. The plaintiffs appeal[1] from the judgment of the trial court, rendered after a court trial, in favor of the defendants. The plaintiffs' primary claim on appeal is that the trial court improperly interpreted the General Statutes to confer jurisdiction over Cockenoe Flats on Westport, rather than on the state. We agree with the plaintiffs that the state has jurisdiction and reverse the judgment in part.

The plaintiffs, Fernando Frillici, John Posh, Melvin Hartman, Jr., the Connecticut Saltwater Sportsmen's Protective Association, Inc., and the Fairfield County League of Sportmen's Clubs, Inc., initiated this action against the defendants, the town of Westport, the Westport shellfish commission, the state of Connecti-

---

[1] The plaintiffs appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to Practice Book § 4023 and General Statutes § 51-199 (c).

cut, the state department of agriculture, the former commissioner of agriculture, Kenneth B. Andersen, and the current commissioner of agriculture, John R. H. Blum. The plaintiffs challenged Westport's exercise of jurisdiction over recreational clamming at Cockenoe Flats, which included the imposition by Westport of a license requirement and limitations on the quantity of clams that an individual can harvest on any one day. In their seven count complaint, the plaintiffs sought: (1) injunctive relief against Westport's continued exercise of jurisdiction over Cockenoe Flats; (2) damages from Westport and the Westport shellfish commission for violations of the Connecticut Unfair Trade Practices Act (CUTPA), General Statutes § 42-110a et seq.; (3) damages from Andersen for deprivation of the plaintiffs' property and liberty interests in violation of the plaintiffs' rights under 42 U.S.C. § 1983 et seq.; (4) damages from Andersen for due process violations pertaining to a hearing held under General Statutes § 26-195 on or about February 27, 1986; (5) damages from Westport and the Westport shellfish commission for deprivation of the plaintiffs' property and liberty interests in violation of 42 U.S.C. §§ 1983, 1985 and 1986; (6) damages from Westport and the Westport shellfish commission for a taking of the plaintiffs' property and liberty interests without due process of law in violation of the fifth amendment to the United States constitution and article first, § 11, of the Connecticut constitution; and (7) damages from Westport and the Westport shellfish commission for conduct that was "wilful, malicious, arbitrary, capricious and with strong hand."

The trial court determined that Westport has jurisdiction over Cockenoe Flats, and rejected all of the plaintiffs' claims accordingly. This appeal followed.

The factual background can be gleaned from the briefs of the parties. The subject of this dispute is an

area of submerged land in navigable waters off the shore of Westport. This area is commonly known as Cockenoe Flats, and lies off Westport's shore between an area known as Saugatuck Shores and Cockenoe Island, which is about three quarters of a mile offshore. Although the parties disagree as to whether the state or Westport has jurisdiction to regulate recreational clamming in this area, it is undisputed that in 1984 Westport asserted such jurisdiction.[2] At that time, pursuant to its local regulations,[3] Westport began to require the purchase of a $10 clamming permit and began enforcing a one peck (now a one-half bushel) daily

---

[2] The defendants also claim that Westport had asserted its authority over shellfishing in the area prior to 1984.

[3] The Westport Shellfish Regulations, as revised to November 30, 1989, provides in relevant part: "I. SHELLFISH COMMISSION . . . .

"C. The [Westport Shellfish] Commission may issue licenses for the taking of shellfish therefrom and fix the fees therefor may designate the quantities of such shellfish to be taken, the sizes of such shellfish and the methods of taking.

\* \* \*

"V. DAILY POSSESSION LIMIT AND HOURS

"A. Pursuant to Public Act No. 83-245, no person who has not been an actual inhabitant or resident of this State for at least thirty (30) days next preceding shall dig or take any clams from the waters or shores thereof.

"B. Pursuant to Section 26-228, of the Connecticut General Statutes, shells or shellfish shall not be taken from any place in the jurisdictional boundaries of the Town of Westport between sunset and sunrise.

"VI. METHODS OF HARVESTING AND SIZE LIMITS

"A. Pursuant to Section 26-252, of the Connecticut General Statutes, no rake, tongs, dredge, or other device shall be used for taking any variety of shellfish, within the jurisdictional boundaries of the Town of Westport, with spaces or openings between the teeth or prongs of less than one (1) inch.

"B. No Round or Hard-shell clams less than one (1) inch in thickness, or which will pass through a ring of one and one-half (1-1/2) inches internal diameter shall be taken. No long-neck clams less than one and one-half (1-1/2) inches in length shall be taken. If any clams are taken not meeting these minimum specifications, they shall, without unnecessary injury, be returned to these waters when taken.

"C. No person shall use any power-driven tool or other commercial device, such as a bull rake, to harvest oysters, clams or mussels within the waters

limit.[4] Although Westport ceased enforcement following complaints, it reasserted jurisdiction following a Superior Court statement that Westport had jurisdiction over Cockenoe Flats.[5] The plaintiffs claim that the regulations imposed by Westport have infringed on their longstanding right to use Cockenoe Flats for recreational clamming.

---

or tidal flats within the limits of the Town of Westport that are under control of the Shellfish Commission.

"VII. CLAMMING LICENSES . . . .

"C. Each Permittee shall pay the following fees for said Permit when issued:

"$2.00 Connecticut Senior Citizen Annual Permit (age 62 and over)

"$10.00 Connecticut Senior Citizen Life Permit

"$10.00 Connecticut Resident Annual Permit . . . ."

[4] The state does not require a permit for recreational clamming of beds under its jurisdiction and imposes a daily limit of one bushel.

[5] In 1984, Frank Palmer, who is not a party in this case, brought a declaratory judgment action against the department of agriculture and Westport to determine the extent of the state's jurisdiction over Cockenoe Flats. The court granted the department's motion to strike, holding that Palmer should seek redress by way of the statutory scheme for resolution of shellfish area boundary disputes provided for under General Statutes § 26-195. *Palmer v. Dept. of Agriculture*, Superior Court, judicial district of Fairfield, Docket No. 21 83 88 (July 1, 1985).

Thereafter, Palmer petitioned the commissioner of agriculture, pursuant to § 26-195, to determine the extent of state jurisdiction over Cockenoe Flats. Following a public hearing, the commissioner determined that Westport had jurisdiction over Cockenoe Flats. Following this determination, a group of interested parties, including some of the plaintiffs in this case, appealed from the commissioner's decision to the Superior Court. That court, *Landau, J.*, concluded that the commissioner had correctly determined that Westport had jurisdiction over Cockenoe Flats, but that the determination had to be vacated because § 26-195 only gives the commissioner authority to settle disputes with respect to shellfish grounds within the exclusive jurisdiction of the state, and the conclusion that Cockenoe Flats was not within the jurisdiction of the state resulted in the case being beyond the scope of the commissioner's authority. *Frillici* v. *Dept. of Agriculture*, Superior Court, judicial district of Fairfield, Docket No. CV86 0230537 S (April 25, 1988). Although the appellants "won" their appeal, it was a hollow victory, and Westport, in reliance on the Superior Court's basis for its holding—that Westport had jurisdiction over Cockenoe Flats—reasserted jurisdiction over the area.

The plaintiffs and the defendants presented extensive testimony before the trial court regarding the history of the jurisdiction over Cockenoe Flats. Both parties agree that, prior to 1881, the state had jurisdiction of all areas from the high water mark seaward. In 1881, the legislature established a jurisdictional line pursuant to which the state retained jurisdiction over all "shell-fisheries" south, or seaward, of the line, and the towns were conferred jurisdiction over all grounds north of the line. Public Acts 1881, c. 160, § 1. The location of this line was revised in 1882, and it is undisputed that Cockenoe Flats lies north of that revised line.[6] Public Acts 1882, c. 123.

In 1909, the legislature enacted chapter 125 of the Public Acts of 1909, the statutory predecessor to General Statutes § 26-257,[7] which authorized the state and

---

[6] The trial court's decision was based on the 1881 line, which it found placed Cockenoe Flats within Westport's jurisdiction. All parties now agree, however, that the 1882 line is controlling.

[7] General Statutes § 26-257 provides: "LOCAL SHELLFISH GROUNDS UNDER STATE CONTROL. When shellfish grounds or franchises located within the limits of the towns of West Haven, New Haven, Milford and Westport, and northerly of the state jurisdiction line, have been surveyed, and a map of the same made and accepted by the commissioner of agriculture according to law, said commissioner shall have and exercise all the powers and duties with reference to the grounds designated thereby which he has with reference to the grounds south of the state jurisdiction line; and any copies of such books, records and maps which were used in connection with such survey shall be kept on file in the office of the commissioner; provided the selectmen of the town of Westport shall have exclusive jurisdiction over, and power to designate, shellfish grounds in the waters, in said town, of all creeks and estuaries tributary to Compo Mill Pond in said town, and the selectmen of the town of Milford shall have exclusive jurisdiction over, and power to designate or lease, shellfish grounds in the waters, in said town, of the Indian River, Gulf Pond and that portion of the Milford Harbor located northerly of the breakwater. The map of such grounds in the town of Milford shall be published with the annual report of the commissioner of agriculture. Taxes and rentals on grounds in the towns of West Haven and Westport and in the city of New Haven and on franchises in the town of Milford designated on such maps shall be paid to the treasurer of the town or city."

the Westport selectmen to cause a map to be made of the shellfish grounds located within the waters of Westport. The act provided that when the map was made and accepted by the state through its shellfish commissioners, "said shell-fish commissioners shall have and exercise all the powers and duties with reference to the grounds designated thereby which they now have or may hereafter legally exercise with reference to the grounds south of the present state jurisdiction line." Public Acts 1909, c. 125, § 2. This map was made, and the grounds designated on the map were returned to the jurisdiction of the state. Whether Cockenoe Flats was within these designated grounds is a disputed issue in this appeal.

I

The plaintiffs claim that the trial court misconstrued the relevant jurisdictional statutes to reach the improper conclusion that Westport, and not the state, has jurisdiction over Cockenoe Flats. First, the plaintiffs argue that the trial court improperly determined that the 1909 legislation and the 1910 map did not transfer jurisdiction over Cockenoe Flats back to the state. The defendants counter that the 1909 legislation purported to transfer only "shell-fish grounds," and that Cockenoe Flats was not understood to be or designated as a "shell-fish ground" and was, therefore, not included on the 1910 map. Second, the plaintiffs argue that if the defendants are correct that the 1909 legislation did not transfer Cockenoe Flats back to the state, then the 1882 legislation never transferred the area to Westport in the first place, because the state jurisdictional line established in 1882 had granted the towns jurisdiction only over "shell fishery grounds" north of the line, and if Cockenoe Flats was not a "shell-fish ground" in 1909, then it had not been a "shell fishery ground" in 1882. Finally, the plaintiffs contend that even if jurisdiction over Cockenoe Flats had been vested

in Westport by virtue of the earlier legislation, the legislature believed the state to have jurisdiction over Cockenoe Flats and confirmed this belief by legislation when it amended General Statutes § 26-280 in 1983. Public Acts 1983, No. 83-236. We agree with this last contention.[8]

The precursor of § 26-280 is General Statutes (Cum. Sup. 1935) § 1356c, enacted by the legislature in 1935.[9] That statute granted authorization to the Westport selectmen to require a written permit to take shellfish from Saugatuck Shores, and allowed them to charge

---

[8] Because we conclude that the 1983 legislation conferred jurisdiction over Cockenoe Flats on the state, we do not consider the effects of the earlier legislation. Even if Westport had jurisdiction following the 1909 legislation and the creation of the 1910 map, later legislative action superseded that arrangement.

At trial, the plaintiffs also pressed a claim that the town and the state were bound by numerous oral and written statements of government officials that the state had jurisdiction over Cockenoe Flats. The trial court rejected this claim. Because the plaintiffs did not brief this claim in this court, they are deemed to have abandoned it, and we do not consider it. *Mather* v. *Griffin Hospital,* 207 Conn. 125, 129 n.2, 540 A.2d 666 (1988).

[9] The original 1935 enactment referred to Saugatuck Shores as being in the towns of Westport and Fairfield. The legislature amended the statute in 1941 to remove references to Fairfield. Public Acts 1941, c. 141. As amended, General Statutes (Sup. 1941) § 573f provided: "TAKING OF SHELL-FISH AT 'SAUGATUCK SHORES.' No person shall take, remove or carry away shell-fish of any kind from the shores, beaches and flats at 'Saugatuck Shores,' so called, in the town of Westport, between June first and October first in each year, except under a written permit issued by the selectmen of said town. Any person, who has been a resident of this state for more than one year continuously, desiring to take shell-fish from said shores, beaches and flats shall make application to the selectmen of said town on a form similar to that provided in connection with licenses or permits for fishing and such selectmen shall issue such number of permits and to such applicants as shall to them appear suitable and proper, and each permittee or licensee shall pay the sum of one dollar for such permit or license when issued to him and such license or permit, unless revoked for cause, shall continue in effect for the balance of the calendar year in which the same shall be issued. Any person who shall take shell-fish from said shores, beaches and flats in violation of the provisions hereof shall be fined not more than twenty-five dollars or imprisoned not more than thirty days or both."

a fee for the permit.[10] Saugatuck Shores, also known as "the great marsh," is an area along the Westport coast that extends to the low water mark. Cockenoe Island lies south, or seaward, of Saugatuck Shores; Cockenoe Flats, the subject of this dispute, is the area that lies between the southern boundary of Saugatuck Shores (the low water mark) and the northern shore of Cockenoe Island. By its terms, § 26-280, and its statutory predecessors, referred only to Westport's jurisdiction over Saugatuck Shores and made no reference to Cockenoe Flats. The statute remained essentially unchanged until 1983.[11]

There apparently was no question or dispute over whether Westport or the state had jurisdiction over Cockenoe Flats until the 1970s. In the late 1960s, Westport acquired title to Cockenoe Island, which previously had been privately owned. Thereafter, Westport attempted to assert jurisdiction over Cockenoe Flats, and an arrest was made in Cockenoe Flats for violation of the Westport shellfish regulations. Although that case was eventually nolled, John Baker, the then chief of the aquaculture division of the state department of agriculture, testified at an evidentiary hearing that the state had jurisdiction over Cockenoe Flats. Shortly thereafter, the Westport town attorney indicated that he also was convinced, in light of his interpretation of the General Statutes and the pronouncements of the state, that the state had jurisdiction over the area. Additionally, the state department of environmen-

---

[10] Consistent with their position that jurisdiction over all waters off Westport was vested in the state in 1909, the plaintiffs argue that this statute was a grant of jurisdiction over Saugatuck Shores to Westport.

[11] The statute was amended in 1947 to provide for shellfishing by residents of Westport, Weston and Wilton in certain areas without a permit, and to require that application be made to the Westport police department for the otherwise required permits. General Statutes (Cum. Sup. 1947) § 905i.

tal protection and the aquaculture division of the state department of agriculture expressed their belief that the state had jurisdiction over Cockenoe Flats.

Following these pronouncements, from the mid-1970s to the early 1980s, Westport did not assert jurisdiction over Cockenoe Flats, although it closely regulated clamming at Saugatuck Shores. Westport limited the number of available shellfishing permits for Saugatuck Shores to approximately 300 for Westport residents and 100 for nonresidents. At the same time, boaters could clam at Cockenoe Flats without restriction.

In 1983, Westport sought legislation in order to allow a newly created Westport shellfish commission to regulate shellfishing at Saugatuck Shores. Until that time, authority over Saugatuck Shores had been vested in the Westport selectmen, rather than a shellfish commission. House Bill No. 6266 purported to amend § 26-280 so as to authorize the newly created Westport shellfish commission, in addition to the Westport selectmen, to regulate shellfishing at Saugatuck Shores.[12]

---

[12] General Statutes § 26-280 provides: "TAKING OF SHELLFISH AT SAUGATUCK SHORES IN WESTPORT. No person shall take, remove or carry away shellfish of any kind from the shores, beaches and flats at 'Saugatuck Shores,' so called, in the town of Westport, between June first and October first in each year, except under a written permit issued by the selectmen of said town or as authorized by the shellfish commission of the town of Westport, provided residents of the towns of Westport, Weston and Wilton may take, remove or carry away shellfish from the shores, beaches and flats between the westerly boundary of Sherwood Island Park and the mouth of the Saugatuck River without obtaining such a permit. Any other person, who has been a resident of this state for more than one year continuously, desiring to take shellfish from said shores, beaches and flats shall make application to the police department of Westport on a form similar to that provided in connection with licenses or permits for fishing and such police department shall issue such number of permits and to such applicants as appear suitable and proper, and each permittee or licensee shall pay the sum of one dollar for such permit or license when issued to him and such license or permit, unless revoked for cause, shall continue in effect for the balance of the calendar year in which the same is issued. Any person who takes shellfish from said shores, beaches and flats in violation of

As the defendants correctly argue, the purpose of the bill was to bring § 26-280 into conformity with General Statutes § 26-257a, which had been enacted in 1963, to authorize the creation of a local shellfish commission in each town to regulate the taking of shellfish from waters under town control.

The proposed bill came under scrutiny by certain members of the local community, including the plaintiffs, who feared that Westport intended a shellfish commission, authorized by the bill, to exert jurisdiction over Cockenoe Flats in addition to Saugatuck Shores. Frillici sent a letter to Senator Eugene Skowronski expressing his concern and the concerns of others regarding the effect of House Bill No. 6266, and urging its defeat lest Westport be permitted to assert jurisdiction over Cockenoe Flats. In response to this letter, Westport sent a letter to Senator Skowronski explaining that although "[c]oncepts regarding expansion of local authority beyond the Saugatuck Shores area were . . . discussed" at a public meeting, "Westport is not pursuing [greater local jurisdiction] in the proposed legislation being considered at the present time."[13]

With this controversy in the background, when House Bill No. 6266 was considered by the Senate, the following amendment to the bill was offered and accepted: "The provisions of this section shall not be deemed to extend the jurisdiction of the selectmen or the shellfish commission of the town of Westport to any shores,

---

the provisions hereof shall be fined not more than twenty-five dollars or imprisoned not more than thirty days or both. The provisions of this section shall not be deemed to extend the jurisdiction of the selectmen or the shellfish commission of the town of Westport to any shores, beaches, or flats not within the jurisdiction of such selectmen or commission on or before October 1, 1983."

[13] A copy of this letter was sent to Senator George L. Gunther, Senator Fred Lovegrove, Representative Julie D. Belaga, Representative Susan Barrett, Representative Elinor Wilber and Representative Christine Niedermeier.

beaches, or flats not within the jurisdiction of such selectmen or commission on or before [October 1, 1983]." Public Acts 1983, No. 83-236.

The plaintiffs argue that the legislative history of this amendment, read in light of the controversy surrounding its enactment, indicates that its purpose was to ensure that jurisdiction over Cockenoe Flats remained with the state, and that even if it was enacted based upon a mistaken assumption that the state had jurisdiction at the time, the legislature's intent must be given effect. We agree.

The defendants argue that resort to the legislative history is unnecessary because the language of the statute is unambiguous and that "the legislative intent is to be found not in what the legislature meant to say, but in the meaning of what it did say." *Muha* v. *United Oil Co.*, 180 Conn. 720, 730, 433 A.2d 1009 (1980). They argue that the 1910 map shows that Cockenoe Flats remained within the jurisdiction of Westport because the area was not designated as shellfish grounds on the map, and therefore did not return to state jurisdiction pursuant to § 26-257.[14] Read in conjunction with the map, they argue, the last line of § 26-280 provides that jurisdiction remains with Westport, as it properly was in 1983, the perception of the legislature notwithstand-

[14] The defendants argue that it is essential to distinguish between designated "grounds," which can be leased to commercial shellfishers, from shellfish "beds," which are public shellfishing areas. They contend that Cockenoe Flats was not a designated shellfish ground, and was therefore not transferred from the town to the state in 1909. The plaintiffs contest the argument that there is a difference between beds and grounds, and argue that the 1909 statute transferred to the state all beds and grounds north of the jurisdictional line. Alternatively, they argue that because the 1882 statute transferred jurisdiction to the town over "shell fishery grounds," if there is a difference between beds and grounds and Cockenoe Flats is a bed, then it never came into Westport's jurisdiction in the first instance. In light of our ultimate conclusion regarding the effect of the 1983 legislation, we need not resolve this dispute.

ing. We agree that reading the last sentence of § 26-280 without resort to the legislative history and the background of understanding against which it was enacted could lead to the defendants' conclusion that the 1910 map is dispositive of jurisdiction. The defendants urge that such a reading, without resort to these aids of statutory construction, is supported by the maxim that " 'when the language of a statute is plain and unambiguous, we need look no further than the words themselves because we assume that the language expresses the legislature's intent.' " *West Hartford Interfaith Coalition, Inc.* v. *Town Council*, 228 Conn. 498, 508, 636 A.2d 1342 (1994), citing *American Universal Ins. Co.* v. *DelGreco*, 205 Conn. 178, 193, 530 A.2d 171 (1987).

We do not agree with the defendants, however, that the language of the amendment is clear on its face and that its meaning can readily be determined without resort to interpretive aids.[15] Indeed, by itself the lan-

---

[15] It is true that, in construing statutes, we have often relied upon the canon of statutory construction that we need not, and indeed ought not, look beyond the statutory language to other interpretive aids unless the statute's language is not absolutely clear and unambiguous. See, e.g., *State* v. *Cain*, 223 Conn. 731, 744–45, 613 A.2d 804 (1992); *Mercado* v. *Commissioner of Income Maintenance*, 222 Conn. 69, 74, 607 A.2d 1142 (1992); *Rose* v. *Freedom of Information Commission*, 221 Conn. 217, 225, 602 A.2d 1019 (1992); *Anderson* v. *Ludgin*, 175 Conn. 545, 552–53, 400 A.2d 712 (1978). That maxim requires some slight but plausible degree of linguistic ambiguity as a kind of analytical threshold that must be surmounted before a court may resort to aids to the determination of the meaning of the language as applied to the facts of the case. See, e.g., *Sanzone* v. *Board of Police Commissioners*, 219 Conn. 179, 187, 592 A.2d 912 (1991). It is also true, however, that we have often eschewed such an analytical threshold, and have stated that, in interpreting statutes, we look at all the available evidence, such as the statutory language, the legislative history, the circumstances surrounding its enactment, the purpose and policy of the statute, and its relationship to existing legislation and common law principles. See, e.g., *Fleming* v. *Garnett*, 231 Conn. 77, 91–92, 646 A.2d 1308 (1994); *State* v. *Metz*, 230 Conn. 400, 409, 645 A.2d 965 (1994); *Glastonbury Volunteer Ambulance Assn., Inc.* v. *Freedom of Information Commission*, 227 Conn. 848, 852–57, 633 A.2d 305 (1993); *Ambroise* v. *William Raveis Real*

guage says nothing about the scope of Westport's juris-
diction prior to October 1, 1983. The statute itself, while
clearly assuming that Westport had jurisdiction over
Saugatuck Shores, gives no indication as to the juris-
dictional status of Cockenoe Flats. Because we must
look beyond the language to outside sources, includ-
ing the map upon which the defendants urge us to rely,
we see no valid reason not to consider the legislative
history and the historical background and understand-
ings regarding jurisdiction over Cockenoe Flats.

We disagree, therefore, with the defendants' asser-
tion that we must make this inquiry with blinders on
regarding what the legislature intended the sentence
to mean. To the contrary, "[i]t is axiomatic that the
process of statutory interpretation involves a reasoned
search for the intention of the legislature." *In re Valerie
D.,* 223 Conn. 492, 512, 613 A.2d 748 (1992); *Lauer* v.
*Zoning Commission,* 220 Conn. 455, 459–60, 600 A.2d
310 (1991). "In seeking to discern that intent, we look
to the words of the statute itself, to the legislative his-
tory and circumstances surrounding its enactment, to
the legislative policy it was designed to implement, and
to its relationship to existing legislation and common
law principles governing the same general subject mat-
ter. . . . *Ambroise* v. *William Raveis Real Estate, Inc.,*
[226 Conn. 757, 764, 628 A.2d 1303 (1993)]; see *Glaston-
bury Volunteer Ambulance Assn., Inc.* v. *Freedom of*

*Estate, Inc.,* 226 Conn. 757, 764, 628 A.2d 1303 (1993); *Texaco Refining
& Marketing Co.* v. *Commissioner of Revenue Services,* 202 Conn. 583, 589,
522 A.2d 771 (1987). This analytical model posits that the legislative pro-
cess is purposive, and that the meaning of legislative language (indeed, of
any particular use of our language) is best understood by viewing not only
the language at issue, but by its context and by the purpose or purposes
behind its use.

We need not, in this case, determine which process is, in general, more
appropriate to the judicial task of statutory construction. Even if we were
to apply the "plain meaning" principle articulated above, we would be
required to examine the extratextual sources in order to discern the meaning
of the 1983 legislation as applied to the facts of this case.

*Information Commission,* 227 Conn. 848, 852–57, 633 A.2d 305 (1993)." (Citations omitted; internal quotation marks omitted.) *State* v. *Metz,* 230 Conn. 400, 409, 645 A.2d 965 (1994); *Fleming* v. *Garnett,* 231 Conn. 77, 91, 646 A.2d 1308 (1994).

Regardless of what the actual status of Cockenoe Flats may have been prior to 1983, as may have been disclosed by the map upon which the defendants rely, we conclude that, by the 1983 enactment of the final sentence of § 26-280, the legislature expressed its intent that jurisdiction be vested in the state. We find persuasive the plaintiffs' argument that even if jurisdiction had been vested in Westport prior to 1983, the legislature reasonably believed jurisdiction to be vested in the state,[16] and enacted the 1983 amendment to § 26-280 specifically to preserve that status.[17] To ignore the intent behind such an amendment would, in effect, contradict our presumption "that there is a purpose behind every sentence, clause, or phrase used in an act and that no part of a statute is superfluous." *Waterbury Petroleum Products, Inc.* v. *Canaan Oil & Fuel Co.,* 193 Conn. 208, 231–32, 477 A.2d 988 (1984); *Turner* v. *Turner,* 219 Conn. 703, 713, 595 A.2d 297 (1991); *Zichichi* v. *Middlesex Memorial Hospital,* 204 Conn. 399, 407, 528 A.2d 805 (1987). That the legislative branch enacts legislation based upon what may be a reasonable but mistaken factual or legal assumption is not a sufficient justification for the judicial branch, in interpreting and applying that legislation to a particular set of facts, to fail to give proper effect to the legislation.

---

[16] Indeed, the trial court determined that "[t]he legislative history of [Public Acts 1983, No.] 83-236 affirms the perception of the legislators and town officials that Westport had no jurisdiction over town waters . . . with the exception of Saugatuck Shores."

[17] Because it is not dispositive of this case, we assume without deciding that prior to the 1983 legislation, jurisdiction over Cockenoe Flats was vested with the town of Westport and we look to what the legislature intended by its 1983 revision of § 26-280.

Every legislator who rose to support the amendment at issue indicated his or her belief that the amendment, which became the last sentence of § 26-280, served to prohibit Westport from exercising jurisdiction over Cockenoe Flats and was designed to preserve jurisdiction in the state. The fact that the legislature added language that referred to the status quo is indicative of the importance the legislature ascribed to maintaining what it perceived to be the status quo: that jurisdiction over Cockenoe Flats was vested exclusively in the state. Senator Skowronski stated that "for the purpose of legislative history, this amendment is offered for the *express purpose* of [e]nsuring that by the provisions of this bill, *the Town of Westport is not acquiring any jurisdiction* over any new waters or new shores, beaches or flats or any clambeds that it does not now have. That's why the amendment is offered and I make these comments to make legislative history on this point." (Emphasis added.) 26 S. Proc., Pt. 7, 1983 Sess., p. 2311. Senator George L. Gunther's remarks were particularly illuminating. He stated: "I rise to support the amendment. I think there has been a lot of distortion on exactly what this bill would have accomplished as it lies in the file. *This will make it abundantly clear that there is no additional jurisdiction being given to the Town of Westport.* There was great concern about the *[Cockenoe]*[18] *Island and some of the flats off of Westport that are under the state's jurisdiction.* This will make it clear that there is no additional jurisdiction, and *that it [is] still under the state's control* and consequently this makes the bill very clear and I think it will clear up all the question[s] on the bill itself." (Emphasis added.) Id., pp. 2311–12. After the amendment was

[18] The transcript indicates that the word preceding "Island" was unintelligible. The plaintiffs however, indicated at oral argument in this court that there was testimony to the effect that the word was "Cockenoe," and in response to direct questioning the defendants did not dispute this assertion.

adopted, Senator Skowronski added: "Now on the bill, as amended, what the bill as amended does is simply [transfer] the jurisdiction of the Saugatuck Shores in Westport now presently under the jurisdiction of the Board of Selectmen in the Town of Westport to the Shellfish Commission of the Town of Westport. As Senator Gunther indicated, and as I indicated, this bill does not give the board of selectmen or the shellfish commission in Westport jurisdiction over any new waters or new areas, it simply transfers the jurisdiction over the areas and waters they now have from the board of selectmen to the Shellfish Commission." Id., pp. 2312–13.

In the House of Representatives, the amendment was read and then remarked upon by Representative Teresalee Bertinuson: "I think it's self-explanatory. It simply makes it very clear that passage of this bill in no way would extend the jurisdiction of the Town of Westport over the *coastal waters*."[19] (Emphasis added.) 26 H.R. Proc., Pt. 12, 1983 Sess., p. 4169. Representative Julie D. Belaga of Westport stated: "I don't object to the amendment. It is known as gilding the lily. It's exactly what I've been saying all along,[20] and if the Senate wishes to waste the paper, so be it." Id., p. 4170. Once the amendment was adopted, the bill was placed on the consent calendar and subsequently passed.

It is clear from the record, therefore, as the trial court concluded, that all of the legislators who spoke had the

---

[19] As the plaintiffs indicated at oral argument, "coastal waters" refers to areas seaward of the low water mark. Saugatuck Shores is the area inland of the low water mark; Cockenoe Flats lies seaward of the low water mark.

[20] The record indicates that Representative Belaga made assurances to the legislature that the newly created Westport shellfish commission would not exercise jurisdiction beyond Saugatuck Shores. Indeed, when the Westport shellfish commission first attempted to exert jurisdiction over Cockenoe Flats in 1984, Representative Belaga contacted First Selectman William Seiden to ask that the commission cease and desist, which he directed it to do.

perception that Cockenoe Flats was within the state's jurisdiction.[21] It is further evident from Senator Gunther's remarks and from the record that the legislature was aware that jurisdiction over Cockenoe Flats was a controversial issue in Westport and neighboring communities. Given that the legislature perceived the state to have jurisdiction, the amendment to the bill must be viewed as a product of the legislature's intent to settle the issue of jurisdiction over Cockenoe Flats in favor of maintaining jurisdiction in the state.

We are convinced that the language of the last sentence of § 26-280 must be given the meaning ascribed to it by the legislature when it passed the legislation. "A statute . . . should not be interpreted to thwart its purpose. . . . *Board of Education* v. *State Board of Labor Relations*, 217 Conn. 110, 126–27, 584 A.2d 1172 (1991)." (Internal quotation marks omitted.) *West Hartford Interfaith Coalition, Inc.* v. *Town Council*, supra, 228 Conn. 508. To read the statute to affirm jurisdiction in Westport would be in direct opposition to the clearly expressed purpose of the legislature.

---

[21] It is also evident from the record that in 1983, Westport, the Westport shellfish commission and the Attorney General's office all believed that Cockenoe Flats was under the exclusive jurisdiction of the state. In 1984, the state department of agriculture also indicated its belief that the state had jurisdiction over Cockenoe Flats by designating it as a state recreation clamming area in official regulations. Section 26-235-1 of the Regulations of Connecticut State Agencies provides in part: "RECREATION CLAMMING AREAS

"The following shores and waters are designated exclusive recreation clam harvesting areas for the purposes of Section 26-235 of the Connecticut General Statutes:

"(a) WESTPORT COCKENOE ISLAND AREA: That area of shores and waters bounded northerly by Westport Saugatuck Shores and the mouth of the Saugatuck River; easterly by designated shellfish ground as shown on map entitled 'Norwalk and Westport Town Oyster Grounds Prepared By The Connecticut Shellfish Commission'; southerly by the jurisdictional line shown on said map, Cockenoe Island and designated shellfish ground as shown on said map; westerly by Sprite Island and the Norwalk and Westport Town Line as shown on said map. (Effective August 27, 1984)."

Because the determination of jurisdiction over coastal waters is a prerogative of the legislature, there can be no doubt that, had the legislature explicitly stated in 1983 that jurisdiction over Cockenoe Flats was to be vested in the state, we would be compelled to agree. We see no justification to thwart the legislature's purpose simply because that purpose could have been stated more clearly.[22] To do so would betray not only the legislature's objective, but also our own fundamental objective—"to ascertain and give effect to the apparent intent of the legislature." *State* v. *Metz,* supra, 230 Conn. 409; *Fleming* v. *Garnett,* supra, 231 Conn. 92.

## II

The plaintiffs ask us to remand the case with instruction to the trial court to render judgment in their favor regarding jurisdiction over Cockenoe Flats and liability, to issue an injunction, and to hold a hearing in damages. Although we agree with the plaintiffs' jurisdictional claim and, therefore, their claim for injunctive relief, we find no merit in their due process claims. We therefore remand the case to the trial court only for consideration of whether an injunction should issue and for a new trial on the plaintiffs' remaining claims for damages.

## A

The plaintiffs claim that the trial court improperly concluded "that the plaintiffs did not suffer a deprivation of any right, privilege or immunity secured by the Constitution or law based upon a hearing held by Commissioner Andersen and the failure of the State and Westport to provide any hearing or notice regarding a change in jurisdiction after more than 76 years of

---

[22] We recognize that there are limits on the degree to which a court properly may give effect to legislative history that the language of the legislation simply will not bear. Given the ambiguity of this legislative language when read against its historical background, however, this is not such a case.

State jurisdiction." We read this claim as challenging the trial court's adverse judgment as to counts three, four and five of the plaintiffs' amended complaint,[23] all of which rely on alleged due process violations pursuant to the fourteenth amendment to the United States constitution.[24] We agree with the trial court's conclusion that the plaintiff's due process rights have not been violated.

"The fourteenth amendment to the United States constitution provides that the 'State [shall not] deprive any person of life, liberty, or property, without due process of law . . . .' In order to prevail on [their] due process claim[s], the plaintiff[s] must prove that: (1) [they have] been deprived of a property [or liberty] interest cognizable under the due process clause; and (2) the deprivation of the property [or liberty] interest has occurred without due process of law. See *Double I Limited Partnership* v. *Planning & Zoning Commission*, 218 Conn. 65, 76, 588 A.2d 624 (1991); *Connecticut Education Assn.* v. *Tirozzi*, 210 Conn. 286, 293, 554 A.2d 1065 (1989) . . . ." *Tedesco* v. *Stamford*, 222 Conn. 233, 241–42, 610 A.2d 574 (1992). An interest

---

[23] In counts three and five, the plaintiffs claim a deprivation of their property and liberty interests under 42 U.S.C. § 1983 et seq. In count four, the plaintiffs claim due process violations pertaining to the Palmer hearing held by Andersen, which is procedurally unrelated to this case.

[24] Counts three, four and five also refer generally to the due process clause of the Connecticut constitution. The plaintiffs have not, however, presented an adequate and independent analysis of any state constitutional claim. "We have repeatedly apprised litigants that we will not entertain a state constitutional claim unless the defendant has provided an independent analysis under the particular provisions of the state constitution at issue." *State* v. *Robinson*, 227 Conn. 711, 721, 631 A.2d 288 (1993). We therefore decline to consider the defendants' state constitutional claims.

In count six, the plaintiffs sought relief for a taking of their property and liberty interests without due process of law in violation of the fifth amendment to the United States constitution and article first, § 11, of our state constitution. Because the plaintiffs did not brief this claim before this court, we deem it to have been abandoned. In any event, we fail to see any basis for a "taking" claim under the facts of this case.

protected or cognizable under the due process clause must have a basis in "existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits . . . ." (Internal quotation marks omitted.) *New England Savings Bank* v. *Lopez,* 227 Conn. 270, 277, 630 A.2d 1010 (1993). The plaintiffs have not met the first prong of this test, because they have failed to establish the deprivation of a protected substantive property or liberty interest cognizable under the federal due process clause.

The plaintiffs argue that the state, through its enactments and actions concerning jurisdiction and by history, custom and usage, conferred a property interest on the plaintiffs to harvest clams in Cockenoe Flats. At oral argument, the plaintiffs' counsel clarified this alleged right to be a "property or liberty right to clam under state jurisdiction free of control from an interloper third-party which is the Town of Westport." The plaintiffs concede, however, that the state could impose the same or more severe restrictions on the plaintiffs' harvesting of clams from Cockenoe Flats without infringing on the plaintiffs' protected rights.[25] This concession, in effect, demonstrates the lack of merit in the plaintiffs' due process claims.

If the plaintiffs do not have a property or liberty interest that would prohibit the state from imposing restrictions on clamming, we fail to see how that alleged interest is offended by the imposition of the same permissible restrictions, even by Westport's purportedly wrongful exercise of jurisdiction. Put another way, although Westport's assertion of jurisdiction over Cockenoe Flats may have been illegal under state law, in

---

[25] As plaintiffs' counsel stated at oral argument, "the state of Connecticut can charge $10 or $100. We don't object to reasonable regulation. . . . We object to unreasonable regulation which is [regulation by] a third party."

the sense that it was not authorized given the 1983 legislation, that illegality does not ipso facto create a substantive property or liberty interest protected under the federal due process clause. Not every instance of illegal government conduct results in a violation of the due process clause.

If there exists any "right to harvest clams," and we do not imply that there is, either the alleged right to harvest clams is a right to harvest clams free of such restrictions or it is a right to harvest clams that allows for such restrictions. The plaintiffs concede that they do not have a protected interest in restriction free clamming. Because the plaintiffs concede that such restrictions, if lawfully imposed, do not infringe on their alleged right to harvest clams, their due process claim fails, because their alleged right, to the extent it is protected from interference, has not been infringed upon by the actions of Westport, the state or any of its subsidiaries or officials. Although the plaintiffs seem to argue that Westport's wrongful exercise of jurisdiction violates their due process rights per se, in the absence of a showing that Westport has overstepped the bounds of a protected property or liberty interest, the plaintiffs' due process claims are without merit.

### B

The plaintiffs also claim damages from Westport and the Westport shellfish commission for (1) alleged violations of the Connecticut Unfair Trade Practices Act (CUTPA), General Statutes § 42-110a et seq. (count two), and (2) conduct that was "wilful, malicious, arbitrary, capricious and with strong hand" (count seven). The trial court rendered judgment for the defendants on these counts based solely on its conclusion that Westport had jurisdiction over Cockenoe Flats and therefore was engaged in a rightful exercise of its regulatory

authority.[26] We remand these claims for consideration in light of our contrary holding on the jurisdictional issue.

## C

We also remand the case to the trial court for a final disposition as to the plaintiffs' request for injunctive relief. In light of our holding on the jurisdictional issue, we would expect an injunction against enforcement of the Westport regulations to issue, unless the trial court determines that, the jurisdictional issue having been authoritatively settled, there is no need for an injunction. We also leave to the discretion of the trial court the plaintiffs' various claims for injunctive relief pertaining to the future exercise of jurisdiction over Cockenoe Flats and the plaintiffs' request for injunctive relief ordering the defendants: (1) to publish, at their expense, an article or notice to the public that no one who clams in the area is required to have a Westport permit; and (2) to refund all moneys received from the sale of clam permits except to those sold to people wishing to clam from Saugatuck Shores.

With respect to counts one, two and seven, the judgment is reversed, and the case is remanded for further proceedings limited to consideration of the plaintiffs' claims (1) for injunctive relief under count one, (2) for damages for alleged CUTPA violations under count two, and (3) for damages under count seven. With respect to counts three, four, five and six, the judgment is affirmed.

In this opinion the other justices concurred.

---

[26] The defendants have not contended that if we reverse the trial court on the jurisdictional issue, the trial court's judgment on these counts should be affirmed on alternative grounds. See Practice Book § 4140 (c).