## NANCY WANNAGOT *v.* CITY OF SHELTON
## (13733)

DUPONT, C. J., and SCHALLER and SPEAR, Js.

Argued April 24—decision released August 15, 1995

*William J. Curran,* for the appellant (plaintiff).

*James T. Baldwin,* for the appellee (defendant).

SPEAR, J. The plaintiff, Nancy Wannagot, is the dependent widow of a volunteer firefighter who died in the line of duty. She appeals from the decision of the workers' compensation commission review board (review board) affirming an order of the workers' compensation commissioner (commissioner). The order reduced the plaintiff's award of benefits and ordered

her to reimburse the city for the overpayment. The dispositive issue on appeal is whether the review board properly calculated the plaintiff's compensation benefits pursuant to General Statutes (Rev. to 1991) § 31-306.[1] We affirm the review board's decision.

The pertinent facts are as follows. On March 15, 1991, Daniel Wannagot (decedent) suffered a fatal heart attack while performing his duties as a volunteer firefighter for the defendant city of Shelton (city). Pursuant to a voluntary agreement, benefits of $719 per week were initially paid to the plaintiff. The sum represented the maximum weekly compensation rate of 150 percent of the average production wage for the fiscal year July, 1989, through June, 1990, totaling $719 per week. After formal proceedings, the commissioner issued a finding and award that the plaintiff was entitled to $319.33 per week, a sum representing 66⅔ percent of the average weekly production wage for the July, 1989, through June, 1990 fiscal year. The commissioner also found that the defendant was entitled to recover the overpayment. The plaintiff appealed that decision to the review board. The review board affirmed the commissioner's decision and this appeal ensued.

Before we reach the merits of the appeal, we must first address the jurisdictional question of whether this appeal is properly before us as a final judgment.[2] "It is axiomatic that appellate review of disputed claims

[1] General Statutes (Rev. to 1991) § 31-306 provides in pertinent part: "(b) Compensation shall be paid on account of death resulting from an accident arising out of and in the course of employment or from an occupational disease as follows . . . (2) To those wholly dependent upon the deceased employee at the time of his injury, a weekly compensation equal to sixty-six and two-thirds per cent of the average weekly earnings of the deceased at the time of the injury but in no case more than the maximum weekly benefit rate set forth in section 31-309 for the year in which the injury occurred or less than twenty dollars weekly. . . ."

[2] This issue was not briefed by the parties. Pursuant to the court's prior written request, they addressed it at oral argument.

of law and fact ordinarily must await the rendering of a final judgment by the compensation review division . . . ." (Citations omitted.) *Szudora* v. *Fairfield*, 214 Conn. 552, 556, 573 A.2d 1 (1990). Because the commissioner's finding and award provided for "a hearing, at the request of any party, to decide how the reimbursement for the overpayment shall be made," we must first resolve whether the decision is in fact a final judgment.

"The test that determines whether such a decision is a final judgment turns on the scope of the proceedings on remand: if such further proceedings are merely ministerial, the decision is an appealable final judgment, but if further proceedings will require the exercise of independent judgment or discretion and the taking of additional evidence, the appeal is premature and must be dismissed." Id. The remand specified that at future proceedings the commissioner would be limited to determining the plaintiff's repayment schedule to the city for the overpayment that she received. The scope of these proceedings, therefore, would be ministerial because the taking of new evidence would not be necessary. The commissioner would not be able to modify the underlying decision that the plaintiff had been overpaid.

In *Kaufman* v. *Zoning Commission*, 232 Conn. 122, 653 A.2d 798 (1995),[3] our Supreme Court held that a decision was a final judgment for appeal purposes, notwithstanding a remand order to impose "reasonable conditions and changes" to the affordable housing application. In reasoning that there was a final judgment, the Supreme Court stated: "We attach significance to the fact that the trial court's judgment did not order further evidentiary determinations on

---

[3] Although *Kaufman* is not a workers' compensation case, we find its reasoning applicable because the test to determine whether the decision was a final judgment similarly focused on the scope of the remand order.

remand. Although the trial court's remand may have *allowed* the commission to hear additional evidence in order to determine whether to impose reasonable conditions on or to make reasonable changes in the application, the remand in no way *required* the commission to conduct such an inquiry.

"Even more important, the trial court's judgment required the commission to approve the plaintiff's application. With respect to this central issue, the trial court's decision so concludes the rights of the parties that further proceedings cannot affect them. . . . After explicitly resolving *all* [of] the issues in favor of the plaintiff . . . the trial court remanded the case only for the limited purpose of allowing the commission to impose reasonable conditions on or make reasonable changes to the development, if it so chose. Because the proceedings on remand cannot deprive the plaintiff of the zone change that the trial court has ordered to be approved, the trial court has rendered a final judgment and this court has subject matter jurisdiction over the commission's appeal." (Citations omitted; emphasis in original; internal quotation marks omitted.) Id., 130–31.

This case is similar to *Kaufman* as the remand was for the discrete purpose of determining the repayment schedule. As such, the proceedings cannot affect the underlying decision that the plaintiff was overpaid and the city is entitled to reimbursement for the overpayment. The remand does not vest the commissioner with the discretion to reduce the amount to which the city is entitled. Because on remand the commissioner cannot deprive the city of its right to reimbursement, but merely can create a repayment schedule, the commissioner's decision is a final judgment. We, therefore, conclude that this court has subject matter jurisdiction.

The parties, at the court's request, also addressed the issue of whether the city was precluded from reducing the plaintiff's weekly benefit because the payments were made pursuant to a voluntary agreement. General Statutes § 31-296[4] provides that if the statutory requirements are met, a voluntary agreement is binding on the parties and reductions can be made only in limited circumstances. Section 31-296 requires that "[a] copy of the agreement, with a statement of the commissioner's approval thereof, shall be delivered to each of the parties and *thereafter* it shall be as binding upon both parties as an award by the commissioner." (Emphasis added.) Although the commissioner approved the agreement, it was never delivered to the parties as required by the statute. The consequence of this failure to meet all of the requirements set forth in § 31-296 is that the voluntary agreement is not binding on the parties. The city has the right, therefore, to seek a reduction in the plaintiff's weekly benefits.

Having resolved these procedural issues, we now turn to the gravamen of the plaintiff's appeal and determine whether the commissioner improperly reduced her weekly benefits. The plaintiff argues that she is entitled to $737 a week, which is the maximum weekly benefit pursuant to § 31-309[5] for the fiscal year from July,

[4] General Statutes § 31-296 provides in pertinent part: "VOLUNTARY AGREEMENTS. If an employer and an injured employee, or in case of fatal injury his legal representative or dependent, at a date not earlier than the expiration of the waiting period, reach an agreement in regard to compensation, such agreement shall be submitted in writing to the commissioner by the employer with a statement of the time, place and nature of the injury upon which it is based; and, if such commissioner finds such agreement to conform to the provisions of this chapter in every regard, he shall so approve it. A copy of the agreement, with a statement of the commissioner's approval thereof, shall be delivered to each of the parties and thereafter it shall be as binding upon both parties as an award by the commissioner. . . ."

[5] General Statutes (Rev. to 1991) § 31-309 provides in pertinent part: "[T]he weekly compensation received by an injured employee under the

1990, through June, 1991. We conclude that the commissioner properly determined that the plaintiff is entitled to $319.33, representing 66⅔ percent of the average weekly production wage for the fiscal year of June, 1989, through June, 1990, pursuant to § 31-306[6] and that the city was entitled to reimbursement for the overpayment.

The plaintiff relies solely on *Going* v. *Cromwell Fire District*, 159 Conn. 53, 267 A.2d 428 (1970), for the proposition that she is entitled to 150 percent of the average weekly production wage pursuant to § 31-309, rather than 66⅔ percent of the average weekly production wage pursuant to § 7-314a (b).[7] Her reliance is misplaced because *Going* does not apply in this situation. In *Going*, a volunteer firefighter, who held a full-time job at Western Electric Company, was injured while performing duties as a volunteer firefighter. The issues involved were (1) the proper rate of compensation where the claimant held more than one "job" and (2) who was liable for the payment of such compensation. The provisions of § 31-306, which provide for benefits equalling 66⅔ percent of the average weekly production wage to dependents of a deceased worker, did not come into play as the plaintiff in *Going* did not die as a result of his injuries. At the time of the plaintiff's injury in *Going*, § 7-314a (b) provided that a volunteer firefighter's wages for compensation purposes was the average weekly production wage and § 31-309 provided that the maximum compensation rate was 100 percent of that wage. The plaintiff relies on the following lan-

provisions of this chapter shall in no case be more than one hundred fifty per cent, raised to the next even dollar, of the average weekly earnings of production and related workers . . . ."

[6] See footnote 1.

[7] General Statutes § 7-314a (b) provides in pertinent part that "the average weekly wage of a volunteer fireman shall be construed to be the average production wage in the state as determined by the labor commissioner under the provisions of section 31-309."

guage in *Going*: "[T]he wage rate shall be taken as that producing the maximum benefit rate as provided under § 31-309. General Statutes § 7-314a (b)." Id., 59. This language simply reflects the happenstance that the two rates were the same at that time. *Going* does not support the proposition that a dependent of a deceased worker is entitled to 150 percent of the average weekly production wage pursuant to the current version of § 31-309 instead of the two-thirds benefit mandated by § 31-306.

The language of the relevant statutes is clear and unambiguous. As a dependent of the decedent, the plaintiff is entitled to benefits pursuant to § 31-306. The benefits include "a weekly compensation equal to sixty-six and two-thirds per cent of the average weekly earnings of the deceased . . . but in no case more than the maximum weekly benefit rate set forth in section 31-309 . . . ." General Statutes § 31-306. It is clear from the statutory language that the claimant is entitled to 66⅔ percent of her husband's weekly earnings up to the maximum weekly benefit set out in § 31-309. Because the decedent died while performing his duties as a volunteer firefighter, his weekly earnings for workers' compensation purposes is governed by § 7-314a (b). That section provides that "the average weekly wage of a volunteer fireman shall be construed to be the average production wage . . . under the provisions of section 31-309."

In interpreting the relevant statutes, we rely on the well established canon of statutory construction that "when the language of a statute is plain and unambiguous, we need look no further than the words themselves because we assume that the language expresses the legislature's intent. . . ." (Citations omitted; internal quotation marks omitted.) *Frillici* v. *Westport*, 231 Conn. 418, 430, 650 A.2d 557 (1994). Furthermore, we recognize that "[i]f there is no ambiguity in the language of the statute, it does not become ambiguous

merely because the parties contend for different meanings." *Caldor, Inc.* v. *Heffernan,* 183 Conn. 566, 571, 440 A.2d 767 (1981).

Because the average weekly production wage under § 31-309 at the time of the decedent's death was $479,[8] the commissioner properly determined that the plaintiff's weekly benefits were 66⅔ percent of $479, equalling $319.33. Section 31-306 provides that a dependent's weekly benefits in no case shall exceed the maximum weekly benefit rate established in § 31-309. The 150 percent provision set forth in § 31-309 is intended to be a ceiling on the maximum benefits that a person may receive. For example, if a worker earning $1500 a week died on March 15, 1991, due to a work related injury, the worker's dependents would not be entitled to $1000 representing two-thirds of $1500. Rather, the dependents would be limited to the maximum benefit of 150 percent of the average production wage, which is $719. When we read §§ 31-306, 31-309 and 7-314a (b) together, we are compelled to conclude that the plaintiff, as the dependent of a volunteer firefighter who died in the line of duty, is entitled to only 66⅔ percent of the average weekly production wage, as the review board properly determined.

The judgment is affirmed.

In this opinion the other judges concurred.

----

[8] The plaintiff argues that she is entitled to the average production wage for the July, 1990, through June, 1991 fiscal year. This argument is defeated by the plain language of the statute. General Statutes (Rev. to 1991) § 31-309 specifically provided that the applicable fiscal year "shall be determined by the labor commissioner on or before the fifteenth day of August of each year, to be effective the following October first, and shall be the average of the manufacturing production and related workers' weekly earnings for the year ending the previous June thirtieth . . . ." Therefore, the applicable fiscal year for the March, 1991 death is the fiscal year that ended the previous June, in this case June, 1990. The commissioner correctly determined that the decedent's wages were the average production wages for the July, 1989, through June, 1990 fiscal year, or $479.