UNITED ILLUMINATING COMPANY *v.*
CITY OF NEW HAVEN ET AL.
(15462)

Borden, Berdon, Katz, Palmer and McDonald, Js.

Argued December 12, 1996—officially released April 22, 1997

*Harold B. Finn III*, with whom were *Patrick J. McHugh, Donna Nelson Heller* and, on the brief, *James R. Hawkins II* and *Michael Koenigsberg*, for the appellants (defendants).

*Mark R. Kravitz*, with whom were *Patrick J. Monahan II* and, on the brief, *John Barnett*, for the appellee (plaintiff).

*Janet C. Spegele, Cynthia L. Amara* and *Stephen Ostrach* filed a brief for the Connecticut Business and Industry Association as amicus curiae.

*Mary-Michelle U. Hirschoff* filed a brief for the Connecticut Conference of Municipalities as amicus curiae.

*Richard Blumenthal,* attorney general, and *Carolyn K. Querijero* and *Gregory T. D'Auria,* assistant attorneys general, filed a brief for the office of policy and management as amicus curiae.

*Opinion*

BORDEN, J. The principal issue of this appeal is whether a municipal tax assessor has the authority, pursuant to General Statutes (Rev. to 1995) § 12-53,[1] to

[1] General Statutes (Rev. to 1995) § 12-53 provides: "Addition of omitted property to list. (a) During the period prescribed by law for the completion of their duties the assessor or board of assessors of each town shall add to the list given in by any person and made according to law any taxable property which they have reason to believe is owned by him and has been omitted from such list, and property so added shall be assessed at the percentage of the actual valuation thereof, as determined by the assessor or board of assessors in accordance with the provisions of sections 12-63, 12-64 and 12-71, from the best information the assessor or board of assessors can obtain, and twenty-five per cent of such assessment shall be added thereto. The assessor or board of assessors shall notify such person, in accordance with section 12-55, of any such increase in the assessed valuation.

"(b) If the assessor or board of assessors of any town believe that taxable property has been omitted from the list given in by any person or that taxable property belongs to any person who has not given in a list, or if the assessor or board of assessors are unable to determine the value of any property without the assistance of the owner, custodian or other person having knowledge of the same, they may give notice in writing to the owner, custodian or other person having knowledge of any such property or the valuation thereof, of the time and place of a hearing with respect thereto. Such notice shall, within three years after the due date for the filing of such list or within three years after the date on which such list is received by the assessor or board of assessors, if later, be placed in the hands of such person or left at his usual place of residence or business or shall be sent to him by registered or certified mail at his last-known place of residence or business. Such notice shall direct the person named therein to appear before the assessor or board of assessors with books of account, papers, documents and other records for examination under oath relative to any such property or the valuation thereof. All omitted taxable property, discovered at such hearing or any adjournment thereof and not listed by the owner as required by law, shall be added to his list by such assessor or board of

revalue and reassess personal property that, for purposes of the grand lists of three prior years, had been identified and valued on the list of personal property submitted by the taxpayer to the assessor and had been

assessors at the percentage of its actual valuation, as determined by the assessor or board of assessors in accordance with the provisions of sections 12-63, 12-64 and 12-71, and twenty-five per cent of such assessment shall be added thereto. Subject to the provisions of sections 12-57 and 12-129, if any property is discovered at such hearing or any adjournment thereof to be listed in error by the owner, it shall be removed from such owner's list by the assessor or board of assessors. No person shall be excused from giving testimony or producing books of account, papers, documents and other records on the ground that such testimony and such production of documents will tend to incriminate him, but such testimony and such production of documentary evidence shall not be used in any criminal proceeding against him. Any person who fails to appear at the time and place of such hearing in such notice designated or at any adjournment thereof, or, having appeared, refuses to answer any pertinent question put to him or who fails to produce the books, papers or other documents mentioned in such notice, shall be fined not more than one hundred dollars or imprisoned not more than thirty days or both. All property which the assessor or board of assessors believes should have been listed for taxation and was not listed and concerning which sufficient information cannot be obtained by them at such hearing, or any adjournment thereof, shall be added to the list at such percentage of the actual valuation thereof from the best information obtainable by the assessor or board of assessors and twenty-five per cent shall be added to such assessment.

"(c) If the assessor or board of assessors of any town adds property to the list of any person or makes out a list for any person not filing a list or increases or decreases the valuation of any taxable property under the provisions of subsection (b), they shall, within thirty days of such hearing or any adjournment thereof give him notice thereof in writing by mailing the same, postage prepaid, to his last-known address and the same shall be held to be sufficient.

"(d) Any person claiming to be aggrieved by the action of the assessor or board of assessors under this section may appeal the doings of the assessor or board of assessors to the board of tax review and the superior court as otherwise provided in this chapter, provided such appeal shall be extended in time to the next succeeding board of tax review if the statutory period for the meeting of such board has passed. Any person intending to so appeal to the board of tax review may indicate that taxes paid by such person for any additional assessment added in accordance with this section, during the pendency of such appeal, are paid 'under protest' and thereupon such person shall not be liable for any interest on the taxes based upon such additional assessment, provided (1) such person shall have paid not less than seventy-five per cent of the amount of such taxes within the time

included at that value on the prior grand lists. The defendants, the city of New Haven, the New Haven tax collector and the New Haven tax assessor, appeal[2] from the partial summary judgment rendered by the trial court in favor of the plaintiff, United Illuminating Company.[3] The defendants claim that the trial court miscon-

specified and (2) the board of tax review reduces valuation or removes items of property from the list of such person so that there is no tax liability related to additional assessment.

"(e) Upon receipt of notice from the assessor or board of assessors of the addition of property to the list of any owner, the tax collector of the town shall, if such notice is received after the normal billing date, within ten days thereafter mail or hand a bill to such owner based upon the property added by the assessor or board of assessors. Such tax shall be due and payable and collectible as other municipal taxes and subject to the same liens and processes of collection, provided (1) such tax for the current fiscal year shall be due and payable in an initial or single instalment due and payable not sooner than thirty days after the date such bill is mailed or handed to such owner and in any remaining, regular instalments as the same are due and payable, and the several instalments of the tax so due and payable shall be equal and (2) such tax for any prior fiscal year shall include interest from the date or dates such tax for the corresponding grand list would have been due."

Although § 12-53 has been amended by No. 95-283 of the 1995 Public Acts, the amendments are not relevant to this appeal. Hereafter, unless otherwise indicated, all references to § 12-53 are to the 1995 revision.

[2] The defendants appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to Practice Book § 4023 and General Statutes § 51-199 (c).

[3] The plaintiff's complaint contains four counts. The first two counts challenge the validity of the defendants' actions in revaluing certain personal property listed by the plaintiff on the list it had submitted for the grand list of October 1, 1990. In the first count, the plaintiff challenges the notice given to it pursuant to § 12-53 (c). In the second count, the plaintiff challenges the power to revalue asserted by the defendants pursuant to § 12-53 (b). In the third and fourth counts, the plaintiff challenges the validity of the agreement between the city and Northeast Financial Management Group, Inc., the contractor that had performed the revaluation challenged in the first two counts.

On cross motions for partial summary judgment on the first two counts, and on the defendants' counterclaim to collect the additional taxes claimed by the defendants, the trial court granted the plaintiff's motion, and denied the defendants' motion. In accordance with the version of Practice Book § 4002 (c) (2) then applicable, the trial court found that the issues involved in those two counts were of such significance to the determination of the

strued § 12-53, and that the assessor has the authority under that statute to revalue property after giving notice of an audit within three years of the filing of the taxpayer's list. As an alternate ground to affirm the trial court's judgment, the plaintiff claims that the notice given to it under § 12-53 (c) was insufficient, and that it did not waive any such deficiency in the notice. We agree with the defendants with respect to their claim, and we disagree with the plaintiff's alternate ground for affirmance. Accordingly, we reverse the judgment of the trial court and remand the case for trial on the third and fourth counts of the complaint.

The parties stipulated to the following facts. On or about November 1, 1990, the plaintiff, a public service company supplying electric power to New Haven and Fairfield counties, filed with the New Haven tax assessor a list of personal property showing a valuation for assessment purposes of its personal property, other than motor vehicles, of $92,079,800. The assessor included all of this listed property on the grand list for October 1, 1990, at the submitted value and, in February, 1991, lodged the October 1, 1990 grand list in the town clerk's office as required by General Statutes (Rev. to 1995) § 12-55.[4] The New Haven tax collector rendered

outcome of the case that any delay incident to an immediate appeal would be justified, thus rendering the partial summary judgment an appealable final judgment, notwithstanding the fact that there were two remaining counts between the same parties to be resolved.

Effective September 3, 1996, in order for such a partial judgment to be considered an appealable final judgment the determination of the trial court regarding the justification for an immediate appeal must be one in which "the chief justice or chief judge of the court having appellate jurisdiction concurs." Practice Book § 4002C (a).

[4] General Statutes (Rev. to 1995) § 12-55 provides: "Lists; notice of increase; public inspection; abstracts. (a) When the lists of any town have been so received or made by the assessor or board of assessors, they shall equalize the same, if necessary, and make any assessment omitted by mistake or required by law. The assessor or board of assessors may increase or decrease the valuation of property as named in any of such lists or in the last-preceding grand list, but, in each case of any increase in valuation of

bills to the plaintiff for that grand list on the basis of the values set forth on the plaintiff's list of personal property, and the plaintiff paid those bills in full.

In a letter dated September 20, 1993, the assessor notified the plaintiff that he was scheduling a hearing pursuant to § 12-53 (b). The hearing took place on September 29, 1993, and various persons testified. In a letter dated October 12, 1993, the assessor notified the plaintiff that the hearing was concluded. On or about October 31, 1993, the plaintiff received three tax bills and accompanying letters from the tax collector. These tax bills set forth a total of $6,315,614.96 claimed to be

such property above the valuation, if any, stated by the person filing such list or in each case of any increase of valuation above the valuation of such property in the last-preceding grand list, except with respect to the valuation of any motor vehicle, they shall send written notice by mail of such increase in accordance with subsection (b) of this section, including in such notice the valuation prior to and after such increase with respect to each parcel of real property or any improvement thereon, the valuation of which has been increased, to the last-known address of the person whose list or valuation is so changed. When such lists have been so completed, the assessor or board of assessors shall arrange such lists in alphabetical order and lodge the same, except as otherwise specially provided by law, in the town clerk's or assessors' office, on or before the thirty-first day of January, for public inspection. Such assessor or board of assessors shall make an abstract of such lists, including the twenty-five per cent added thereto, shall take and subscribe the oath provided by law, which shall be certified by the officer administering the same and endorsed upon or attached to such abstract, and, except as otherwise specially provided by law, shall lodge such abstract in the town clerk's office, on or before the thirty-first day of January next after the date prescribed for the filing of such lists, for public inspection. Any assessor or board of assessors of any town who fails to comply with any provision of this section shall be fined five dollars.

"(b) The written notice of assessment increase as required in subsection (a) of this section shall be mailed on or before the tenth day immediately following the date on which the grand list abstract is signed and attested to by the assessor or board of assessors. If such assessment increase notice is sent later than the time period herein prescribed, such increase shall become effective on the next succeeding grand list."

Although § 12-55 has been amended by No. 95-283 of the 1995 Public Acts and by No. 96-171 of the 1996 Public Acts, the amendments are not relevant to this appeal. Hereafter, unless otherwise indicated, all references to § 12-55 in this opinion are to the 1995 revision.

due for the October 1, 1990 grand list, and were based on an increase in the value of the plaintiff's personal property from the values that had been declared by the plaintiff and included by the assessor on that grand list. The increase in valuation resulted in an increase in the assessment, after application of a 70 percent equalization factor, of the plaintiff's personal property from $92,079,800 to $143,416,860. The plaintiff received no written communication from the defendants in the thirty days following October 12, 1993, other than the three tax bills and accompanying letters of October 31, 1993.

Thereafter, the plaintiff appeared before the New Haven board of tax review and requested that the tax bills be declared illegal. The board of tax review denied this relief. The plaintiff brought this action by amended complaint, pursuant to General Statutes § 12-119[5] seeking: (1) a declaratory judgment that the taxes sought

[5] General Statutes § 12-119 provides: "Remedy when property wrongfully assessed. When it is claimed that a tax has been laid on property not taxable in the town or city in whose tax list such property was set, or that a tax laid on property was computed on an assessment which, under all the circumstances, was manifestly excessive and could not have been arrived at except by disregarding the provisions of the statutes for determining the valuation of such property, the owner thereof or any lessee thereof whose lease has been recorded as provided in section 47-19 and who is bound under the terms of his lease to pay real property taxes, prior to the payment of such tax, may, in addition to the other remedies provided by law, make application for relief to the superior court for the judicial district in which such town or city is situated. Such application may be made within one year from the date as of which the property was last evaluated for purposes of taxation and shall be served and returned in the same manner as is required in the case of a summons in a civil action, and the pendency of such application shall not suspend action upon the tax against the applicant. In all such actions, the Superior Court shall have power to grant such relief upon such terms and in such manner and form as to justice and equity appertains, and costs may be taxed at the discretion of the court. If such assessment is reduced by said court, the applicant shall be reimbursed by the town or city for any overpayment of taxes in accordance with the judgment of said court."

to be collected were illegal;[6] and (2) temporary and permanent injunctive relief against the collection of those taxes. The defendants filed a counterclaim for collection of the taxes at issue.

The parties filed cross motions for partial summary judgment on the first two counts of the complaint and the counterclaim. The trial court concluded that the assessor lacked authority under § 12-53 to increase the assessment of the plaintiff's personal property on the October 1, 1990 grand list. The trial court determined, however, that with respect to the plaintiff's alternate claim that the increased assessment was illegal because the assessor had failed to provide written notice to the plaintiff of the increased assessment within thirty days of the hearing as required by § 12-53 (c), the plaintiff had waived any defect in the notice by appealing to the board of tax review. Nonetheless, because the plaintiff had established one of its two contentions, the trial court granted the plaintiff's motion for partial summary judgment,[7] and denied the defendants' motion. Upon

---

[6] Included in this claim is a request for a declaratory judgment that the contract between the defendants and Northeast Financial Management Group, Inc., the contractor that had performed the revaluation for the assessor, is void as contrary to public policy. The record does not reflect whether the parties or the court deemed it necessary to give Northeast Financial Management Group, Inc., notice of this action pursuant to Practice Book § 390 (d) as a predicate to the rendition of any such declaratory judgment. We suggest that, on remand, consideration be given to this question.

[7] Although the trial court rejected the plaintiff's claim of lack of notice, the court nonetheless rendered partial summary judgment for the plaintiff on the first count of its complaint, which addressed the notice claim, as well as on the second count of its complaint, which addressed the assessor's power under § 12-53. Furthermore, although the defendants' motion for summary judgment also sought judgment on their counterclaim, the court did not mention the counterclaim in its memorandum of decision or judgment. We must consider the case as it was actually decided by the trial court, however, rather than how the judgment was framed. Consequently, we conclude that summary judgment actually was rendered for the plaintiff on the second count of its complaint, which challenged the authority of the assessor to revalue personal property pursuant to § 12-53, and on the

certification by the trial court that the delay incident to an appeal was justified; see footnote 3; this appeal followed.

I

The defendants claim that the trial court's interpretation of § 12-53 was improper. More specifically, the defendants claim that the assessor's authority under § 12-53 (b) to conduct an audit regarding the valuation of the taxpayer's property within three years after the filing of the taxpayer's list of personal property necessarily carries with it the implied power to revalue that property for tax purposes, and that this implied power is specifically referred to in § 12-53 (c). The plaintiff contends, to the contrary, that the trial court properly interpreted § 12-53, that the assessor's only authority under § 12-53 is to add omitted property, and that the assessor's authority to revalue listed property instead must be exercised pursuant to § 12-55. We agree with the defendants.

The process of statutory interpretation involves a reasoned search for the intention of the legislature. *Frillici* v. *Westport*, 231 Conn. 418, 431, 650 A.2d 557 (1994). In other words, we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of this case, including the question of whether the language actually does apply. In seeking to determine that meaning, "we look to the words of the statute itself, to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter." (Internal quotation marks omitted.) Id.; *Carpenteri-Waddington, Inc.* v. *Commissioner of Revenue Ser-*

counterclaim, and for the defendants on the first count the complaint, which challenged the statutory notice to the plaintiff under § 12-53.

*vices*, 231 Conn. 355, 362, 650 A.2d 147 (1994); *United Illuminating Co.* v. *Groppo*, 220 Conn. 749, 755–56, 601 A.2d 1005 (1992). From the language of § 12-53, its legislative history and the circumstances surrounding its enactment, the policy it was designed to implement, and its relationship to other legislation governing the same subject matter, we conclude that an assessor has the authority under § 12-53 (b) and (c) to revalue and reassess, for tax purposes, property that was listed and valued on a grand list filed within the previous three years.

Section 12-53 is part of the general statutory scheme for the taxation of personal property by municipalities. In general terms, under General Statutes § 12-40,[8] taxpayers are required to file lists "of the taxable property belonging to them on the first day of October in that year." Under General Statutes (Rev. to 1995) § 12-42,[9]

---

[8] General Statutes § 12-40 provides: "Assessors to publish notices requiring lists. The assessors in each town, except as otherwise specially provided by law, shall, on or before the fifteenth day of October annually, post on the signposts therein, if any, or at some other exterior place near the office of the town clerk, or publish in a newspaper published in such town or, if no newspaper is published in such town, then in any newspaper published in the state having a general circulation in such town, a notice requiring all persons therein liable to pay taxes to bring in written or printed lists of the taxable property belonging to them on the first day of October in that year."

[9] General Statutes (Rev. to 1995) § 12-42 provides: "Time for giving in tax list; penalty for failure to file. Each resident of any town liable to give in a list and pay taxes therein shall, except as otherwise specially provided by law, on or before the first day of November, annually, give in his list, made as prescribed by law, making a separate description of each parcel of real estate. When reference can be made to a map on file in the town clerk's office, such reference shall be a sufficient description. If he fails to file such list, the assessors shall fill out a list for him, putting therein all property which they have reason to believe is owned by him, liable to taxation, at the percentage of its actual valuation, as determined by the assessors in accordance with the provisions of sections 12-64 and 12-71, from the best information they can obtain, and add thereto twenty-five per cent of such assessment and in such list they shall make a separate description and assessment of each parcel of real estate. When the first day of November is Sunday, the list may be made out on the day following."

each taxpayer must file its list with the assessor by November 1 and, under General Statutes (Rev. to 1995) § 12-49,[10] must declare under penalties of false statement that the list "is a true statement of all my property liable to taxation." Under § 12-55,[11] the assessor, upon receipt of the lists, after making any adjustments permitted by that section, is required, by the following January 31, to: (1) arrange the lists in alphabetical order; (2) lodge them either in the assessor's office or the town clerk's office for public inspection; and (3) make "an abstract" of the lists and lodge this "grand list abstract" in the town clerk's office for public inspection. This "grand list abstract" is what is known as the grand list for October 1 of the particular year. Thus, under § 12-55, the assessor has a ninety day window of time— from November 1 through the following January 31—within which to revalue personal property before including it in the grand list for that taxable year. Under General Statutes (Rev. to 1995) § 12-63,[12] the assessor

Although § 12-42 has been amended by No. 96-224 of the 1996 Public Acts, the amendments are not relevant to this appeal.

[10] General Statutes § 12-49 provides: "Lists to be verified. The assessors in each town shall require each person giving in a tax list to sign, date and deliver to them a statement upon such list in the following form; and each person giving in a tax list shall sign, date and deliver to the assessors a statement upon such list in said form:

"I do hereby declare under penalty of false statement that the foregoing list, according to the best of my knowledge, remembrance and belief, is a true statement of all my property liable to taxation. I also declare under penalty of false statement that I have not conveyed or temporarily disposed of any estate for the purpose of evading the laws relating to the assessment and collection of taxes.

"Dated at . . . . this . . . . day of . . . . , 19. . .

Each person signing and delivering to the assessors a false statement of the foregoing form shall be subject to the penalty provided for false statement. Any assessor failing to comply with the provisions of this section shall be fined not more than fifty dollars for each offense."

[11] See footnote 4.

[12] General Statutes (Rev. to 1995) § 12-63 provides: "Rule of valuation. The present true and actual value of land classified as farm land pursuant to section 12-107c, as forest land pursuant to section 12-107d, or as open space land pursuant to section 12-107e shall be based upon its current use

is required to value the property for tax purposes at its "fair market value."

This system rests on two fundamental premises. First, it is, in the first instance, a self-reporting system. "It is well settled that it is the responsibility of the taxpayer to provide the assessor with sufficient facts to value personal property for tax purposes." *IBM Credit Corp. v. Board of Tax Review*, 227 Conn. 826, 829, 633 A.2d 294 (1993). It is a self-reporting system by practical necessity, because it simply would be too burdensome on municipal assessors to locate, identify and value all of the taxable personal property in their environs.

Second, and closely related to the first, it is a system that has long rested on the notion that taxation "be as nearly equal as possible. Hence, it is the policy of the law to require all property, except such as is specially exempted, to bear its proportion of the public burdens." *Cornwall* v. *Todd*, 38 Conn. 443, 447–48 (1871); *Low Stamford Corp.* v. *Stamford*, 164 Conn. 178, 181, 319 A.2d 369 (1972) ("[t]he incidents of taxation should fall, as far as possible, equally on all similarly situated"). This notion of equality is closely related to the success of the self-reporting system because, to the extent that property tax burdens fall equally on all taxable property, taxpayers are more likely to comply willingly and honestly with their self-reporting obligations. Indeed, § 12-55 (a) explicitly recognizes this notion of equality by providing that "[w]hen the lists of any town have been

without regard to neighborhood land use of a more intensive nature, provided in no event shall the present true and actual value of open space land be less than it would be if such open space land comprised a part of a tract or tracts of land classified as farm land pursuant to section 12-107c. The present true and actual value of all other property shall be deemed by all assessors and boards of tax review to be the fair market value thereof and not its value at a forced or auction sale."

Although § 12-63 was amended by No. 96-171 of the 1996 Public Acts, the amendments are not relevant to this appeal. References to § 12-63 in this opinion are to the 1995 revision.

so received or made by the assessor or board of assessors, they shall equalize the same, if necessary . . . ." See footnote 4. We have referred to this obligation as "a continuing duty . . . to achieve administratively a fair and equal assessment for all taxpayers. The power to equalize the lists, if necessary, imports a watchtower role for the assessor to correct inequalities . . . ." *84 Century Ltd. Partnership* v. *Board of Tax Review*, 207 Conn. 250, 262, 541 A.2d 478 (1988).

The fact that the personal property taxation system is a self-reporting system premised on the notion of equality in tax imposition also suggests, however, a need for some mechanisms by which the assessor can make adjustments in the information that is supplied to him for purposes of arriving at a fair and equitable tax on all property, as well as suggesting some limitations on the use of those mechanisms. With this background in mind, therefore, we turn to one of those mechanisms, namely, the provisions of § 12-53.

We start with the language. Section 12-53 is entitled, "Addition of omitted property to list." Section 12-53 (a) provides that the assessor, during "the period prescribed by law for the completion of [his] duties . . . shall add to the list given in by any person . . . any taxable property which [the assessor has] reason to believe is owned by [the taxpayer] and has been omitted from such list," and that this added property shall be assessed at the appropriate percentage of its true market value. There is no dispute that subsection (a) applies only to property that was omitted from—that is, was not included in—the list submitted by the taxpayer. Indeed, prior to the legislative amendments involved in this case, the predecessor to § 12-53 had been held to apply only to property added to the list, and not to an increased valuation of property listed. See *Wilcox* v. *Madison*, 103 Conn. 149, 154, 130 A. 84 (1925). At issue

in the present case, however, is the meaning of the current language of § 12-53 (b) and (c).

Section 12-53 (b) provides in general terms that, if the assessor believes "that taxable property has been omitted" from a taxpayer's list, if the assessor believes that "taxable property belongs to any person who has not given in a list," or if the assessor is "unable to determine the value of any property without the assistance of the owner," the assessor may give notice to the owner of a hearing regarding "any such property or the valuation thereof." This notice must be given "within three years after the due date for the filing of such list or within three years after the date on which such list is received by the assessor . . . if later." General Statutes § 12-53 (b). The notice "shall direct the person named therein to appear before the assessor . . . with books of account, papers, documents and other records for examination under oath relative to such property or the valuation thereof." General Statutes § 12-53 (b). This hearing is what the defendants refer to as an audit, the notice of which must be given no more than three years after the filing of the taxpayer's list for the prior year in question. Subsection (b) goes on to provide that "[a]ll omitted taxable property" discovered at this hearing shall be added to the taxpayer's list at its fair market value, plus a 25 percent penalty. Thus, subsection (b), although it specifically explains the treatment of property omitted from the list but disclosed by the audit, does not explicitly deal with anything else that might be disclosed by the audit, such as an undervaluation of the property as initially submitted on the taxpayer's list and included on the October 1 grand list for that prior year.

Subsection (c) of § 12-53, however, provides that "[i]f the assessor . . . adds property to the list of any person or makes out a list for any person not filing a list *or increases or decreases the valuation of any taxable*

*property under the provision of subsection (b),"* the assessor shall, "within thirty days of such hearing or any adjournment thereof give [the taxpayer] notice thereof in writing by mailing the same, postage prepaid, to his last-known address and the same shall be held to be sufficient." (Emphasis added.)

The language of subsection (b) of § 12-53, taken together with the language of subsection (c), strongly suggests that, as the defendants argue, the power to audit necessarily carries with it the implied power to revalue. Subsection (b) gives the assessor, within three years of the submission of the personal property list, the power to audit the taxpayer's books and records. This audit power, however, is not limited to property that has been omitted from the taxpayer's list or to property of a taxpayer who has not submitted a list. This power also applies when "the assessor . . . [is] unable to determine the value of any property without the assistance of the owner . . . ." General Statutes § 12-53 (b). The word "value" in this clause must be read to mean fair market value because that is the benchmark for the assessor's function. See General Statutes § 12-63. Thus, under subsection (b) of § 12-53, if, within the three year period, the assessor has a doubt about the fair market value of property contained on the current or a prior year's list that cannot be satisfied "without the assistance of the owner" of the property, he has the power to initiate an audit with respect to that property.

Subsection (c) of § 12-53 provides that if the assessor, as a result of the audit procedure authorized by subsection (b) of § 12-53, adds property to a taxpayer's list, generates a list for a taxpayer who has failed to file one, "or increases or decreases the valuation of any taxable property under the provisions of subsection (b)," he is required, "within thirty days of such hearing [under subsection (b)] or any adjournment thereof," to

give the taxpayer written notice thereof. Thus, there is statutory symmetry between the audit power provided in subsection (b) and the notice requirement in subsection (c). Just as the audit power under subsection (b) applies in three instances—when there is property omitted, when no list was submitted, and when the assessor questions the accuracy of the fair market value of listed property—the notice requirement under subsection (c), which is specifically linked to the audit conducted under subsection (b), applies in three instances—when omitted property is being added, when a list is being generated when none had been submitted, and when the assessor increases or decreases the value of any property.

Because it confirms that the increase or decrease in value determined by the assessor under subsection (c) of § 12-53 was the result of the assessor's inquiry into the property's fair market value under subsection (b) of § 12-53, this symmetry lends weight to the linguistic suggestion that the audit power implies the power to revalue. There would be little purpose to an audit, based on the assessor's doubt about the accuracy of the fair market value of property and permitting an "examination under oath relative to . . . *the valuation thereof*"; (emphasis added) General Statutes § 12-53 (b); that did not give the assessor the authority to take appropriate action based on the results of that audit. Indeed, because the same clause that gives the assessor the authority to "increase" value gives him the corresponding authority to "decrease" value, the contrary conclusion would also mean that, if the audit disclosed that the questioned property had been overvalued on the taxpayer's list, the assessor would be powerless to reduce the taxpayer's burden accordingly. Similarly, there would be little purpose in requiring the assessor to give statutory written notice of an increase or decrease in the value of property if that notice were

not going to result in some financial consequence to the taxpayer. We do not ordinarily read legislative language in such a way as to render it superfluous. *Stratford* v. *State Board of Mediation & Arbitration*, 239 Conn. 32, 55, 681 A.2d 281 (1996).

Although we have not previously specifically read taxing statutes to give implied powers to municipal taxing authorities, the principle has deep roots in our jurisprudence of municipal law that, in addition to those powers specifically conferred by statute, public officials have those implied powers that are necessary to the proper execution of their duties. See *Gesmonde, Pietrosimone, Sgrignari, Pinkus & Sachs* v. *Waterbury*, 231 Conn. 745, 750, 651 A.2d 1273 (1995) (municipal commission has implied power to hire outside counsel in light of corporation counsel's conflict of interest); *Perretta* v. *New Britain*, 185 Conn. 88, 102, 440 A.2d 823 (1981) (in absence of express provision, authority necessary for effective exercise of granted municipal power conferred by implication); *Hartford* v. *American Arbitration Assn.*, 174 Conn. 472, 479, 391 A.2d 137 (1978) (same); *Mallory* v. *Huntington*, 64 Conn. 88, 94, 29 A. 245 (1894) (authority of selectmen to submit claim to arbitration implied from power to prosecute and defend actions); *Union* v. *Crawford*, 19 Conn. 331, 336 (1848) (authority of selectmen to prosecute and defend actions implied from power to manage town and settle actions against it). We see no compelling reason to preclude that principle from operating with respect to assessors.

Furthermore, this conclusion is buttressed by the genealogy of § 12-53, and by the legislative history of the language at issue in this case. Before 1984, the statute provided that, if the assessor were to call the taxpayer in for an audit, he must have given notice of the audit at least ten days before the "date prescribed by law for the completion of the duties of the assessors."

General Statutes (Rev. to 1983) § 12-53 (b).[13] At that time, General Statutes (Rev. to 1983) § 12-53 (c) provided for notice by the assessor to the taxpayer only if the assessor added omitted property to the list or made out a list for a taxpayer who had not filed one "under the provisions of either or both of subsections (a) and (b)." Thus, prior to 1984, subsection (c) did not explicitly provide for revaluation of any property, and

---

[13] General Statutes (Rev. to 1983) § 12-53 (b) provided: "If the assessors of any town believe that taxable property has been omitted from the list given in by any person or that taxable property belongs to any person who has not given in a list, or if the assessors are unable to determine the value of any property without the assistance of the owner, custodian or other person having knowledge of the same, they may give notice in writing, to the owner, custodian or other person having knowledge of any such property or the valuation thereof, of the time and place of a hearing with respect thereto. Such notice shall, at least ten days before the date prescribed by law for the completion of the duties of the assessors, be placed in the hands of such person or left at his usual place of residence or business or shall be sent to him by registered or certified mail at his last-known place of residence or business. Such notice shall direct the person named therein to appear before the assessors with books of account, papers, documents and other records for examination under oath relative to any such property or the valuation thereof. All omitted taxable property, discovered at such hearing or any adjournment thereof and not listed by the owner as required by law, shall be set in his list by such assessors at the percentage of its actual valuation, as determined by the assessors in accordance with the provisions of sections 12-63, 12-64 and 12-71, and ten per cent of such assessment shall be added thereto. No person shall be excused from giving testimony or producing books of account, papers, documents and other records on the ground that such testimony and such production of documents will tend to incriminate him, but such testimony and such production of documentary evidence shall not be used in any criminal proceeding against him. Any person who fails to appear at the time and place of such hearing in such notice designated or at any adjournment thereof, or, having appeared, refuses to answer any pertinent question put to him or who fails to produce the books, papers or other documents mentioned in such notice, shall be fined not more than one hundred dollars or imprisoned not more than thirty days or both. All property which the assessors believe should have been listed for taxation and was not listed and concerning which sufficient information cannot be obtained by them at such hearing, or any adjournment thereof, shall be set in the list at such percentage of the actual valuation thereof from the best information obtainable by the assessors and ten per cent shall be added to such assessment."

it explicitly linked its provisions regarding omitted property and the failure to file a list with the provisions of both subsections (a)[14] and (b) of General Statutes (Rev. to 1983) § 12-53. Additionally, subsection (c), like subsection (b), provided that the notice in writing of such action was required to be given by assessors on or before the "date prescribed by law for the completion of their duties." General Statutes (Rev. to 1983) § 12-53 (c).[15] The "date prescribed by law for the completion of [the assessor's] duties," when the assessor was required to lodge the grand list in the town clerk's office for public inspection, was then, and is now, January 31. General Statutes (Rev. to 1983) § 12-55 (b).

Thus, prior to 1984, it was fairly clear under General Statutes (Rev. to 1983) § 12-53 that: (1) subsection (a) applied only to omitted property; (2) whatever audit power an assessor had under subsection (b) was required to be exercised by January 31 of the assessment year; and (3) if the assessor were to add omitted property or make out a list of property for a taxpayer who had failed to file one, under either subsection (a) or (b), the assessor was required to do so by January 31. Essentially, then, before 1984, General Statutes (Rev. to 1983) § 12-53 operated in pari materia with General

---

[14] General Statutes (Rev. to 1983) § 12-53 (a) provided: "The assessors of each town shall add to the list given in by any person and made according to law any taxable property which they have reason to believe is owned by him and has been omitted from such list, and property so added shall be assessed at the percentage of the actual valuation thereof, as determined by the assessors in accordance with the provisions of sections 12-63, 12-64 and 12-71, from the best information the assessors can obtain, and ten per cent of such assessment shall be added thereto."

[15] General Statutes (Rev. to 1983) § 12-53 (c) provided: "If the assessors of any town add property to the list of any person or make out a list for any person not filing a list under the provisions of either or both of subsections (a) and (b), they shall, on or before the date prescribed by law for the completion of their duties, give him notice thereof in writing by mailing the same, postage prepaid, to his last-known address and the same shall be held to be sufficient."

Statutes (Rev. to 1983) § 12-55 because under either the assessor had only a ninety day window of time in which to challenge the taxpayer's list of personal property.

In 1984, however, the legislature amended General Statutes (Rev. to 1983) § 12-53 (b) and (c) by virtue of No. 84-477 of the 1984 Public Acts. That public act extended the period of time for an assessor to give notice of an audit under subsection (b), and for the assessor to notify the taxpayer of changes to his list under subsection (c), from January 31 to the "end of the assessment year."[16] Thus, the period of time in which the assessor could bring in a taxpayer for an audit was extended, in effect, from ninety days to one year. Similarly, the period under subsection (c) within which the assessor was required to notify the taxpayer of an addition to his list or of the making out a list was extended from ninety days to one year. Public Act 84-477 did not, however, amend General Statutes (Rev. to 1983) § 12-53 (a).[17]

---

[16] Section 1 of No. 84-477 of the 1984 Public Acts amended General Statutes (Rev. to 1983) § 12-53 (b) and (c) by deleting "date prescribed by law for the completion of the duties of the assessors," and inserting in place thereof, "end of the assessment year." Section 1 of Public Act 84-477 also added what are now subsections (d) and (e) of § 12-53, which provide for an appeal to the board of tax review and to the court, and for the billing and collection procedures by the tax collector.

[17] The legislative history of Public Act 84-477 is equivocal regarding whether it was intended to extend the time within which an assessor could audit solely for the purpose of adding omitted property to the taxpayer's list (or of filing a list for a taxpayer who had not done so), or whether it also was intended to permit an audit for the purpose of revaluing previously undervalued property. Most of the discussion in the Joint Standing Committee on Finance, Revenue and Bonding, regarding Committee Bill No. 596, which ultimately became Public Act 84-477, concerned the need of the assessors for an extension of the period of time within which to conduct their audits, which previously were required to "occur within the months of November, December and January," which are "the busiest months within the assessor's office." Conn. Joint Standing Committee Hearings, Finance, Revenue and Bonding, Pt. 2, 1984 Sess., p. 562, testimony of Charles Agli, assistant assessor for the city of New Britain. Although Agli stated in his testimony regarding the need for the bill that "the experience of the various

After the 1984 amendments, therefore, it was fairly clear under § 12-53 that: (1) the provisions of subsection (a), regarding omitted property, remained the same; (2) whatever audit power an assessor had under subsection (b) was extended to the end of the assessment year; and (3) the period for the notice to the taxpayer, under subsection (c), of an addition of omitted property or the making out of a list, under either subsection (a) or subsection (b), was also extended to the end of the assessment year. Furthermore, after the 1984 amendments, § 12-53 no longer operated in pari materia with § 12-55, because the time period for action by the assessor under § 12-53 was one year, whereas the time period for action by the assessor under § 12-55 remained—and remains—at ninety days.

In 1986, the legislature revisited § 12-53 by enacting No. 86-84 of the 1986 Public Acts.[18] Public Act 86-84

municipalities that have these audit programs has been that there's been significant under-declaration"; id., p. 565; we cannot tell from this testimony whether he was referring simply to an underdeclaration in the sense of omitted property, or whether he also meant to include an underdeclaration of the value of listed property. Similarly, the brief floor debate referred only to situations in which "the assessor finds any property . . . during the year that had not been listed by" the taxpayer; 27 H.R. Proc., Pt. 19, 1984 Sess., p. 7055, remarks of Representative Linda N. Emmons; and to the authority of the assessor "to audit lists of any assessment year and make additions at any time prior to the end of such assessment year"; 27 S. Proc., Pt. 6, 1984 Sess., p. 2269, remarks of Senator Michael J. Skelley.

[18] Public Acts 1986, No. 86-84 provided: "AN ACT CONCERNING TIME FOR AUDITS OF PERSONAL PROPERTY ASSESSMENT LISTS, NOTICE REQUIREMENTS, VALUATION PROCEDURE AND COMPUTATION OF INTEREST RELATED TO ADDITIONS BY THE ASSESSOR TO TAXPAYER'S LIST.

"Section 1. Section 12-53 of the general statutes is repealed and the following is substituted in lieu thereof:

"(a) [The] DURING THE PERIOD PRESCRIBED BY LAW FOR THE COMPLETION OF THEIR DUTIES THE ASSESSOR OR BOARD OF assessors of each town shall add to the list given in by any person and made according to law any taxable property which they have reason to believe is owned by him and has been omitted from such list, and property so added shall be assessed at the percentage of the actual valuation thereof, as determined by the ASSESSOR OR BOARD OF assessors in accordance with the provi-

amended subsections (a), (b) and (c) of General Statutes (Rev. to 1985) § 12-53. It amended subsection (a) in two significant respects: (1) it specifically provided that the assessors' action under subsection (a)—namely, adding omitted property to a taxpayer's list—was to be effected "[d]uring the period prescribed by law for the completion of their duties," namely, by Janu-

sions of sections 12-63, 12-64 and 12-71, from the best information the ASSESSOR OR BOARD OF assessors can obtain, and ten per cent of such assessment shall be added thereto. THE ASSESSOR OR BOARD OF ASSESSORS SHALL NOTIFY SUCH PERSON, IN ACCORDANCE WITH SECTION 12-55, OF ANY SUCH INCREASE IN THE ASSESSED VALUATION.

"(b) If the ASSESSOR OR BOARD OF assessors of any town believe that taxable property has been omitted from the list given in by any person or that taxable property belongs to any person who has not given in a list, or if the assessors are unable to determine the value of any property without the assistance of the owner, custodian or other person having knowledge of the same, they may give notice in writing, to the owner, custodian or other person having knowledge of any such property or the valuation thereof, of the time and place of a hearing with respect thereto. Such notice shall, [at least ten days before the end of the assessment year,] WITHIN THREE YEARS AFTER THE DUE DATE FOR THE FILING OF SUCH LIST OR WITHIN THREE YEARS AFTER THE DATE ON WHICH SUCH LIST IS RECEIVED BY THE ASSESSOR OR BOARD OF ASSESSORS, IF LATER, be placed in the hands of such person or left at his usual place of residence or business or shall be sent to him by registered or certified mail at his last-known place of residence or business. Such notice shall direct the person named therein to appear before the ASSESSOR OR BOARD OF assessors with books of account, papers, documents and other records for examination under oath relative to any such property or the valuation thereof. All omitted taxable property, discovered at such hearing or any adjournment thereof and not listed by the owner as required by law, shall be added to his list by such ASSESSOR OR BOARD OF assessors at the percentage of its actual valuation, as determined by the ASSESSOR OR BOARD OF assessors in accordance with the provisions of sections 12-63, 12-64 and 12-71, and ten per cent of such assessment shall be added thereto. Subject to the provisions of sections 12-57 and 12-129, if any property is discovered at such hearing or any adjournment thereof to be listed in error by the owner, it shall be removed from such owner's list by the assessor OR BOARD OF ASSESSORS. No person shall be excused from giving testimony or producing books of account, papers, documents and other records on the ground that such testimony and such production of documents will tend to incriminate him, but such testimony and such production of documentary evidence shall not be used in any criminal proceeding against him. Any person who fails to appear at the time and place of such hearing in such notice designated or

ary 31 following the October 1 assessment date; and (2) it specifically provided that, when such omitted property is added to the list, the assessor "shall notify

at any adjournment thereof, or, having appeared, refuses to answer any pertinent question put to him or who fails to produce the books, papers or other documents mentioned in such notice, shall be fined not more than one hundred dollars or imprisoned not more than thirty days or both. All property which the ASSESSOR OR BOARD OF assessors believe should have been listed for taxation and was not listed and concerning which sufficient information cannot be obtained by them at such hearing, or any adjournment thereof, shall be added to the list at such percentage of the actual valuation thereof from the best information obtainable by the ASSESSOR OR BOARD OF assessors and ten per cent shall be added to such assessment.

"(c) If the ASSESSOR OR BOARD OF assessors of any town add property to the list of any person or make out a list for any person not filing a list OR INCREASE OR DECREASE THE VALUATION OF ANY TAXABLE PROPERTY under the provisions of [either or both of subsections (a) and] SUBSECTION (b), they shall, [on or before the end of the assessment year] WITHIN THIRTY DAYS OF SUCH HEARING OR ANY ADJOURNMENT THEREOF give him notice thereof in writing by mailing the same, postage prepaid, to his last-known address and the same shall be held to be sufficient.

"(d) Any person claiming to be aggrieved by the action of the assessor OR BOARD OF ASSESSORS under this section may appeal the doings of the assessor OR BOARD OF ASSESSORS to the board of tax review and the superior court as otherwise provided in this chapter, provided such appeal shall be extended in time to the next succeeding board of tax review if the statutory period for the meeting of such board has passed. Any person intending to so appeal TO THE BOARD OF TAX REVIEW may indicate that taxes paid by such person for any additional assessment added in accordance with this section, during the pendency of such appeal, are paid 'under protest' and thereupon such person shall not be liable for any interest on the taxes based upon such additional assessment, provided (1) such person shall have paid not less than seventy-five per cent of the amount of such taxes within the time specified AND (2) THE BOARD OF TAX REVIEW REDUCES VALUATION OR REMOVES ITEMS OF PROPERTY FROM THE LIST OF SUCH PERSON SO THAT THERE IS NO TAX LIABILITY RELATED TO ADDITIONAL ASSESSMENT.

"(e) Upon receipt of notice from the assessor OR BOARD OF ASSESSORS of the addition of property to the list of any owner, the tax collector of the town shall, if such notice is received after the normal billing date, within ten days thereafter mail or hand a bill to such owner based upon the property added by the assessor OR BOARD OF ASSESSORS. Such tax shall be due and payable and collectible as other municipal taxes and subject to the same liens and processes of collection, provided (1) such tax FOR THE CURRENT FISCAL YEAR shall be due and payable in an initial or single

such person, in accordance with section 12-55, of any such increase in the assessed valuation." Public Act 86-84 amended subsection (b) by extending the time period for the assessor to notice an audit from the end of the assessment year to "within three years after the due date for the filing of such list or within three years after the date on which such list is received by the assessor . . . if later . . . ." Furthermore, Public Act 86-84 amended subsection (c) in three significant respects: (1) in addition to the preexisting authority of the assessor to add property to a taxpayer's list and to make out a list for a taxpayer who had not filed one, the public act added the authority to "increase or decrease the valuation of any taxable property"; (2) it deleted the preexisting reference in subsection (c) to "the provisions of either or both of subsections (a) and (b)," and provided that the assessor's action under subsection (c)—namely, adding omitted property, making out a list, or revaluing property—would be "under the provisions of subsection (b)"; and (3) it provided that, upon taking any such action, the assessor shall notify the taxpayer in writing "within thirty days of such hearing [under subsection (b)] or any adjournment thereof."

The amendments to subsection (a) of § 12-53, when read together with the amendment to subsection (c) of § 12-53 eliminating the reference to subsection (a), and when also read together with § 12-55, are significant, because they, for the first time, created a difference in

instalment due and payable not sooner than thirty days after the date such bill is mailed or handed to such owner and in any remaining, regular instalments as the same are due and payable, and the several instalments of the tax so due and payable shall be equal AND (2) SUCH TAX FOR ANY PRIOR FISCAL YEAR SHALL INCLUDE INTEREST FROM THE DATE OR DATES SUCH TAX FOR THE CORRESPONDING GRAND LIST WOULD HAVE BEEN DUE.

"Sec. 2. This act shall take effect from its passage and shall be applicable to the assessment list for the assessment year commencing October 1, 1986, and each assessment year thereafter."

treatment between, on the one hand, the addition of omitted property by the assessor under § 12-53 (a) and, on the other hand, the addition of omitted property, the making out of a list when none had been filed, or the revaluation of listed property by the assessor under § 12-53 (b) and (c). This difference is, in essence, that under the provisions of § 12-53 (a), unlike the provisions of § 12-53 (b) and (c), the assessor may, by January 31, add omitted property to a taxpayer's list without the necessity of—indeed, without the authority for—an audit of the taxpayer's books and records. Under the provisions of § 12-53 (b) and (c), however, the assessor has three years in which to notice an audit of the taxpayer regarding omitted property under the following circumstances: if either no list has been filed or the assessor has a doubt about the valuation submitted by the taxpayer, and if, as a result of that audit, the assessor adds omitted property, generates a list when none has been filed, "or increases or decreases the valuation of any taxable property under the provisions of subsection (b)"; General Statutes § 12-53 (c); the assessor must give written notice of his action within thirty days of the hearing.

This difference in treatment between the provisions of § 12-53 (a) and the provisions of § 12-53 (b) and (c) is confirmed by the 1986 amendment to § 12-53 (a) requiring the assessor to notify the taxpayer in such a case "in accordance with section 12-55, of any such increase in the assessed valuation" of the taxpayer's property by virtue of the addition of omitted property. Section 12-55 (a) permits the assessor, who neither needs to nor is authorized to perform an audit, to revalue a taxpayer's property that is listed on the taxpayer's current list or was included on the previous grand list, provided that the assessor mails written notice to the taxpayer "in accordance with subsection (b) of" § 12-55. Section § 12-55 (b) requires that the

notice of such increase in valuation is to be mailed "on or before the tenth day immediately following the date on which the grand list abstract is signed and attested to by the assessor . . . ." Thus, as a result of the 1986 amendments, the assessor may, under § 12-53 (a), add omitted property to the taxpayer's current list without an audit and, if he does so, he is required to give notice of that action under the provisions of § 12-55 (b).

In effect, therefore, this portion of the 1986 amendment regarding § 12-53 severed any link between the assessor's action of adding omitted property under the provisions of § 12-53 (a) and his actions under § 12-53 (b) and (c). In other words, as a result of this amendment, when the assessor adds omitted property to the current list of a taxpayer, without an audit, he gives notice to the taxpayer of an increase in the total value of its list, by virtue of that addition, pursuant to § 12-55 (b) and not pursuant to § 12-53 (b) or (c).

This difference in treatment is reinforced by the 1986 amendment to General Statutes (Rev. to 1985) § 12-53 (c), which eliminated the reference to subsection (a). Before 1986, when an assessor, under § 12-53 (c), added omitted property or made out a list when none had been filed, he did so "under the provisions of *either or both of subsections (a) and (b)*." (Emphasis added.) General Statutes (Rev. to 1985) § 12-53 (c). After the 1986 amendment, however, when the assessor adds property, under § 12-53 (c), makes out a list when none had been filed, or increases or decreases the value of any property, he does so "under the provisions of *subsection (b)*" only. (Emphasis added.) This amendment means that, when the assessor takes remedial action, after conducting an audit under the provisions of § 12-53 (b), he does so only under the provisions of § 12-53 (b) and (c), and not pursuant to any authority given him under § 12-53 (a).

The net effect of these amendments is to separate out two different procedures, and to make clear that they operate pursuant to different statutory sections. Under the first procedure, the assessor adds omitted property to a taxpayer's current list without conducting an audit. In that situation, the assessor operates pursuant to the provisions of § 12-53 (a) and gives the taxpayer its notice pursuant to the provisions of § 12-55. Under the second procedure, the assessor, as a result of an audit of a taxpayer's list filed, or not filed, within the past three years, including the current list: (1) adds omitted property to that list; (2) makes out a list when none had been filed; or (3) increases or decreases the value of any property on that list. In that situation, the assessor conducts the audit pursuant to § 12-53 (b), and gives the taxpayer its notice pursuant to § 12-53 (c).

This evolution of the provisions of § 12-53 (b) and (c), and their ultimate statutory separation from the provisions of § 12-53 (a), support the conclusion that the assessor's authority under § 12-53 (b) and (c) includes the authority to revalue listed property. The specific link between the assessor's actions under § 12-53 (c), which are described in terms that include increasing or decreasing the value of any property, and the results of his audit conducted under § 12-53 (b), is further evidence of a legislative purpose to provide the assessor with the authority to revalue as an implied necessary incident of the assessor's authority to audit. Furthermore, the corresponding separation of his authority to add omitted property, without an audit, under § 12-53 (a), from his actions under § 12-53 (c), and the link between his authority under § 12-53 (a) to the notice he is required to give under § 12-55, undermine the plaintiff's insistence that § 12-53 applies only to the addition of omitted property.

The legislative history of the 1986 amendments also strongly supports the conclusion that they were

intended to give the assessor the implied authority, under § 12-53 (b) and (c), to revalue listed property pursuant to an audit. Despite the plaintiff's assertion to the contrary, it is now well settled that testimony before legislative committees may be considered in determining the particular problem or issue that the legislature sought to address by the legislation. See *State* v. *Ledbetter*, 240 Conn. 317, 337, 692 A.2d 713 (1997); *State* v. *Magnano*, 204 Conn. 259, 274 n.8, 528 A.2d 760 (1987), and cases cited therein. This is because legislation is a purposive act; *Frillici* v. *Westport*, supra, 231 Conn. 430–31 n.15; and, therefore, identifying the particular problem that the legislature sought to resolve helps to identify the purpose or purposes for which the legislature used the language in question. Accordingly, we first turn to the committee hearings on the bill that ultimately became Public Act 86-84.

Charles Feldman, a personal property tax auditor for the city of New Haven, was one of the principal witnesses before the Joint Committee on Finance, Revenue and Bonding regarding Senate Bill No. 402, which ultimately became Public Act 86-84. Feldman's testimony indicates that one of the problems that the legislature sought to address by the bill was that many companies, despite just having been audited, would revert to under-reporting their personal property the next year because they viewed the risks of noncompliance to be less than the potential gain.[19] Significantly, as a specific example

---

[19] "[O]ne of the most disturbing facts that I have uncovered during that time [in which he was auditing for the city of New Haven] is that after an audit is completed in one particular year, many companies in question will revert to their inaccurate reporting tactics the following year. . . . By having the ability to go back three years time and correct these inaccurate assessments on each of the prior Grand Lists, and subsequently apply stiffer penalties, I believe this practice of widespread noncompliance will diminish or virtually disappear. . . . For many companies, particularly the larger corporations with the most at stake, it is a calculated risk whether or not to report accurately. . . . For many companies, particularly the larger ones, this risk makes sound economic sense." Conn. Joint Standing Committee

of the kind of underreporting that the bill sought to address, Feldman cited the instance of a company that had significantly undervalued its personal property on its tax list, which resulted in a significant tax loss to the city.[20]

The floor debate, although much more sparse and less specific, does nothing to dispel the strong suggestion arising from the committee hearing that one purpose of the bill was to reach the kind of underreporting that Feldman had identified, namely, undervaluing of listed personal property. Senator James H. McLaughlin reported to the Senate that the bill had been requested by the "Board of Assessors," and that "it would basically allow us to do just what the Internal Revenue Service does now." 29 S. Proc., Pt. 3, 1986 Sess., p. 1009. The reference to the Internal Revenue Service conceivably can be read narrowly to refer only to the fact that, under federal law, tax audits go back only three years. See Internal Revenue Code, 26 U.S.C. § 6501 (a). Particularly in light of the testimony before the committee, however, it more plausibly is read broadly to include the fact that if a federal taxpayer were to inflate the cost of its assets for purposes of a depreciation deduction, the Internal Revenue Service could certainly go

Hearings, Finance, Revenue and Bonding, Pt. 1, 1986 Sess., pp. 376–77, remarks of Charles Feldman.

[20] "I have an example, this is a company in New Haven . . . [that] recently reported an assessment of $460,532 in [the] 1982 Grand List. As a result, an audit has been done by myself, the assessment increased to $1,408,241. The total tax dollar gain for New Haven was $69,088 for the current Grand List. *However, this company had only been report[ing] 35% of cost for all personal property assets for the last ten years. Causing a loss of over $729,000 in tax revenue for the City. Under the present system, we cannot recover any of that net tax loss. Hypothetically, if we could go back three Grand Lists, we could recover over $218,000 of this loss, plus penalty. I ask you on behalf of the auditors and assessors to support [Senate Bill No.] 402.*" (Emphasis added.) Conn. Joint Standing Committee Hearings, Finance, Revenue and Bonding, Pt. 1, 1986 Sess., pp. 377–78, remarks of Charles Feldman.

back and revalue those assets for the same three years. This reading is consistent with the view of the assessors, articulated by Feldman, that, in an analogous situation, municipal taxing authorities should have the authority to go back three years in order to determine whether a taxpayer has underreported the value of its personal property for purposes of the personal property tax.

Furthermore, we note that, as the parties agreed at oral argument to this court, § 12-53 (b) and (c) are the only statutory provisions that an assessor has available to him to remedy a fraudulent undervaluation of personal property that is not discovered within the very brief time period provided by § 12-55. Although there is no suggestion of such improper conduct in the present case, we cannot blind ourselves to the fact that such conduct does occur. It is difficult to conceive that the legislature, having given the assessors the authority to audit for three years of grand lists, did not also intend to give them the power to remedy a fraudulent undervaluation disclosed by the exercise of that authority.

Finally, we afford some weight to the fact that the Handbook for Connecticut Assessors, which was cosponsored by the Connecticut office of policy and management, specifically recognizes a difference between omitted property and underreported, or undervalued, property, and specifically notes that, pursuant to § 12-53, assessors may increase the value of undervalued personal property disclosed by their audits under that statute.[21] The office of policy and management has

---

[21] "Beginning with the 1986 Grand List, the assessor must '. . . give notice . . . of the time and place of a hearing . . .' within three years of the November 1st Declaration filing date or within three years of the date a Declaration was actually filed. A hearing date for an audit of the 1991 Grand List, for example, may be scheduled at any time on or prior to November 1, 1994. If as a result of such hearing, omitted property is discovered, it may be added to the 1991 Grand List together with a twenty-five percent assessment penalty. *If property which was declared is found to have been under-reported (i.e., the cost was understated), the assessment may be*

the statutory responsibility to promote uniformity of municipal assessment practices, issue uniform guidelines pertaining to methods of property valuation and assessment, and assist municipal assessors by preparing manuals and handbooks regarding those functions. General Statutes (Rev. to 1995) § 12-2b.[22] This handbook, which was issued pursuant to those statutory responsibilities, is entitled to some deference as a statement of the practical construction of § 12-53 by one of the agencies charged with the responsibility for implementing that statute. *New Haven* v. *United Illuminating Co.*, 168 Conn. 478, 493, 362 A.2d 785 (1975); *Fenn*

*increased but no penalty can be applied.*" (Emphasis added.) Handbook for Connecticut Assessors (Connecticut Association of Assessing Officers, Office of Policy and Management of the State of Connecticut and Institute of Public Service of the University of Connecticut, 1992 Ed.) c. 10, p. 12.

[22] General Statutes (Rev. to 1995) § 12-2b provides: "Duties of secretary of office of policy and management re municipal assessment. The secretary of the office of policy and management shall: (1) Promote uniformity throughout the state in municipal assessment practices, procedures and administration; (2) recommend municipal assessment practices and procedures; (3) issue uniform guidelines pertaining to methods and techniques for property valuation, appraisal and assessment; (4) assist municipal assessors by preparing manuals, handbooks of rules and regulations, and digests of property tax laws suitably annotated; (5) in consultation with the commissioner of agriculture, develop schedules of unit prices for property classified under sections 12-107a to 12-107e, inclusive, update such schedules by October 1, 1990, and every five years thereafter, and make such data, studies and schedules available to municipalities and the public; (6) develop regulations setting forth standards and tests for: Certifying revaluation companies and their employees, which regulations shall ensure that a revaluation company is competent in appraising and valuing property, certifying revaluation companies and their employees, requiring that a certified employee supervise all valuations performed by a revaluation company for municipalities, maintaining lists of certified revaluation companies and upon request, advising municipalities in drafting contracts with revaluation companies, and conducting investigations and withdrawing the certification of any revaluation company or employee found not to be conforming to such regulations. The regulations shall provide for imposition of a fee payable to a testing service designated by the secretary to administer certification examinations."

Although § 12-2b has been amended by No. 95-307 of the 1995 Public Acts and by No. 96-114 of the 1996 Public Acts, the amendments are not relevant to this appeal.

v. *Planning & Zoning Commission*, 24 Conn. App. 430, 437, 589 A.2d 5, cert. denied, 219 Conn. 908, 593 A.2d 133 (1991); cf. *Levanti* v. *Dow Chemical Co.*, 218 Conn. 9, 16, 587 A.2d 1023 (1991). Indeed, we have previously been guided by this handbook in interpreting statutes regarding local taxation. See *Ralston Purina Co.* v. *Board of Tax Review*, 203 Conn. 425, 437–38 n.14, 525 A.2d 91 (1987); see also *Holbrook* v. *Casazza*, 204 Conn. 336, 339, 528 A.2d 774 (1987), cert. denied, 484 U.S. 1006, 108 S. Ct. 699, 98 L. Ed. 2d 651 (1988) (office of policy and management is state agency charged with supervision of municipal assessors).

The plaintiff's arguments begin with the well established authority that a municipality has only those powers of taxation expressly granted to it by the legislature, that such powers must be exercised in strict conformity to the terms by which they were given, and that any doubt regarding such powers must be resolved against the municipality and in favor of the taxpayer. *Pepin* v. *Danbury*, 171 Conn. 74, 83, 368 A.2d 88 (1976). From this foundation, the plaintiff argues that: (1) § 12-55, and not § 12-53, contains the legislature's express and explicit grant of authority to revalue personal property; (2) § 12-53 confers no authority on an assessor to revalue such property; (3) the notice provision in § 12-53 (c) does not empower an assessor to revalue property already listed on a previous grand list; (4) the power to revalue cannot be conferred on assessors by necessary implication; and (5) even if we were to consider § 12-53 to be ambiguous with respect to the assessor's power, the ambiguity must be resolved in the taxpayer's favor. We are not persuaded by any of these contentions.

We do not disagree with the axioms for construing municipal taxing powers articulated in *Pepin* v. *Danbury*, supra, 171 Conn. 83. These axioms, however, cannot displace the need for careful and thoughtful

interpretation of statutes regarding taxation, nor can they displace the firm conclusions that such a process of interpretation yields. These axioms, like all rules or canons of statutory construction, serve as important guidelines to the determination of legislative meaning. To permit them to displace the conclusions that careful interpretation yields, however, would be a disservice to the legislative process, as well as to the judicial exercise of interpreting legislative language based upon the premise that the legislature intends to enact reasonable public policies.

Although it has a superficial textual appeal, the plaintiff's first argument—that the power to revalue property exists only pursuant to § 12-55—is unpersuasive. It is true, as the plaintiff points out, that pursuant to § 12-55 (a) an assessor "may increase or decrease the valuation of property as named in any of such [current] lists or in the last-preceding grand list . . . ." We do not read this explicit grant of authority under § 12-55, however, to preclude a similar authority under § 12-53 (b) and (c).

First, because the assessor has no power to audit under § 12-55, this authority cannot arise as a result of any audit performed by an assessor. Thus, any exercise of the revaluation authority under this section could only come about when the assessor somehow knows, from sources other than an audit of the taxpayer's books and records, that property on a current taxpayer's list, or on the previous grand list, was valued improperly. It simply is not reasonable to infer that the legislature intended to give assessors the authority to revalue property, based on sources other than the taxpayer's records, but to deny them the authority to revalue property based on records revealed through an audit of the taxpayer, which records are likely to provide more reliable information than some other sources. Second, although prior to the legislative amendments to § 12-53,

and particularly the 1986 amendments, a strong textual case could have been made for the proposition that revaluation could have occurred only under § 12-55,[23] that argument cannot survive the enactment of those amendments. This brings us to the plaintiff's second argument.

The plaintiff further argues that § 12-53 only applies to *omitted* property—that is, property owned by the taxpayer on October 1, but not listed by it on the list submitted to the assessor under that statute. Relying on the title of the section, the references in both subsections (a) and (b) of § 12-53 to "omitted property," and, again, the corresponding reference in § 12-55 to revaluation, the plaintiff contends that we are bound by the plain language of the statute to conclude that it does not empower an assessor to revalue property. We do not read § 12-53 so restrictively.

First, as we have explained, subsection (a) of § 12-53 governs only omitted property. The assessor's authority under its provisions, however, has been specifically separated from his authority under subsections (b) and (c) of § 12-53, and has, instead, been specifically linked to his authority under § 12-55. Thus, under both § 12-53 (a) and § 12-55, the assessor acts without having conducted an audit, and must do so within the time

---

[23] The argument would have been that, because the window of opportunity for the assessor to act would have been essentially the same under §§ 12-53 and 12-55, namely, until the grand list is filed; see, e.g., *Empire Estates, Inc.* v. *Stamford*, 147 Conn. 262, 264–65, 159 A.2d 812 (1960) (once assessor has completed duties and filed grand list, no power exists to alter assessments except for clerical errors); *National CSS, Inc.* v. *Stamford*, 195 Conn. 587, 593–94, 489 A.2d 1034 (1985) (same rule articulated with respect to 1973 and 1974 tax years); and because only § 12-55 mentioned revaluation, the inference to be drawn was that revaluation must be governed solely by § 12-55. As we have explained previously, however, the statement of law articulated in *Empire Estates, Inc.*, and *National CSS, Inc.*, no longer applies to § 12-53 (b) and (c), because in both 1984 and 1986 the legislature lengthened the time for action by the assessor—to one year, in 1984, and then to three years, in 1986.

limits set by §§ 12-53 (a) and 12-55. Second, under § 12-53 (b) the assessor's power to audit is not limited to omitted property; it specifically includes those instances in which the assessor is "unable to determine the value of any property without the assistance of the owner," and specifically includes the power to require the owner to appear for "examination under oath relative to any such property *or the valuation thereof.*"[24] (Emphasis added.) Third, this contention ignores the provisions of § 12-53 (c) and the specific statutory link between the assessor's authority under that subsection and his authority under subsection (b) of § 12-53. This brings us to the plaintiff's third argument.

The plaintiff next contends that "[s]ubsection (c) of § 12-53 plainly is a notice provision that grants no power to assessors at all." The plaintiff argues that: (1) subsec-

---

[24] The plaintiff relies heavily on the fourth sentence of subsection (b) of § 12-53, which provides: "All omitted taxable property, discovered at such hearing . . . and not listed by the owner as required by law, shall be added to his list by such assessor . . . at the percentage of its actual valuation, as determined by the assessor . . . in accordance with the provisions of sections 12-63, 12-64 and 12-71, and twenty-five per cent of such assessment shall be added thereto. . . ." We do not read this sentence as urged by the plaintiff, namely, as confining the entire subsection to omitted property. Instead, we read it as imposing the specific penalty of 25 percent of the assessment for omitted property that is discovered during the audit conducted pursuant to subsection (b). Indeed, we have stated that "General Statutes § 12-53 [(b)] authorizes a penalty only for property omitted from a list." *Northeast Datacom, Inc.* v. *Wallingford,* 212 Conn. 639, 651, 563 A.2d 688 (1989). This reading is consistent with: (1) the provisions of subsection (a) of § 12-53; (2) the position of the Handbook for Connecticut Assessors; and (3) the position of the defendants in this case, who disclaimed in oral argument that the penalty of 25 percent under subsection (b) could be applied to anything other than omitted property.

Thus, despite the dissent's insistence that we have somehow bypassed the "punitive nature of § 12-53 (a) and (b)," we have not done so. The 25 percent penalty only applies to omitted property, not to all property reassessed pursuant to § 12-53 (a) and (b). Upon reading the dissent, however, one would think that we have, under the guise of interpreting § 12-53, reinstated the tax on tea that prompted the famous party in Boston Harbor in 1773.

tion (c) specifically refers to subsection (b) of § 12-53, which, in the plaintiff's view, only applies to omitted property and to property that the assessor determines should *not* have been on the taxpayer's list; and (2) the "increases or decreases in valuation" under subsection (c) refer only to such changes in the total value of a taxpayer's list—in effect, the bottom line, but not to any of its specific items. Although we agree that subsection (c) is specifically linked to subsection (b), we disagree that subsection (b) is confined to omitted or erroneously included property on a taxpayer's list, as we have explained. Furthermore, under the language of § 12-53 (c), the assessor is to give notice to the taxpayer if he "increases or decreases the valuation of *any taxable property* under the provisions of subsection (b) . . . ." (Emphasis added.) A more plausible reading of this language is that it applies, not to the bottom line of a taxpayer's list, but to any specific property included thereon. This reading, moreover, is consistent with our conclusion that the assessor has the implied power under subsection (b) to revalue property. That leads us to the plaintiff's fourth contention.

The plaintiff argues that the doctrine of necessary implication of municipal powers "is appropriate only to imply *incidental* or *secondary* powers that are necessary to implement a general, or express, power conferred by the General Assembly," and that such an implication is not appropriate in this case. (Emphasis added.) We disagree with this narrow interpretation of the implied authority doctrine and reaffirm the proposition that "[w]hen a general power is given to a municipal officer, whatever is necessary for effective exercise of that power is, in the absence of express authority, conferred by implication." *Hartford* v. *American Arbitration Assn.*, supra, 174 Conn. 479. Under § 12-53 (b), the assessor *has* the power to audit a taxpayer's books and, in the process, to require the taxpayer to submit to

examination under oath regarding its property "or the valuation thereof." This is a general power to audit regarding valuation of property listed by the taxpayer, including property that may have been fraudulently undervalued. Moreover, this power to audit takes place within the general obligation of the assessor to equalize the burden of taxation, so as to help effectuate the self-reporting system envisioned by the entire statutory scheme.

Under these circumstances, it is hardly extravagant to imply, from the power to audit, the power to revalue based on the results of that audit. We acknowledge that we ought to be cautious about implying power to taxing authorities. In the present case, however, the grant of the audit power to the assessor and the obligation of the assessor to notify the taxpayer of an increase or decrease in the value of the taxpayer's property as a result of that audit strongly suggest the corresponding implied power to revalue that property for tax purposes, and the strength of that suggestion is sufficient to over-come any caution about recognizing such an implied power.

In any event, unlike the usual cases involving the implied authority doctrine, in the present case we are confronted by a set of specific statutory amendments enacted for certain purposes. The question, therefore, is not whether the power to audit carries with it the power to revalue, as a general matter or as a matter of law. The question, instead, is whether the legislature, in enacting the 1986 amendments, intended to give the implied power to revalue as an incident of the power to audit that it explicitly granted. To be sure, the legislation could have been drafted more clearly so as to make explicit what was only implied. We are persuaded, how-ever, from the legislative language, genealogy and his-tory, that the legislature did have that purpose. "We see no justification to thwart the legislature's purpose

simply because that purpose could have been stated more clearly." *Frillici* v. *Westport*, supra, 231 Conn. 436.

The plaintiff's final argument is that, even if § 12-53 is ambiguous regarding whether the assessor has the authority to revalue, the axiom that any ambiguity must be resolved in the taxpayer's favor mandates that we affirm the trial court's judgment. We are not persuaded that this axiom controls this case.

First, like the closely related axioms articulated in *Pepin* v. *Danbury*, supra, 171 Conn. 83 (municipalities have only taxing powers expressly granted by legislature, exercisable only in strict conformity to grant thereof), this long-standing axiom of statutory construction applied to taxing statutes is an important guideline to legislative meaning, but it cannot displace the result of careful and thoughtful interpretation. In the present case, that process of interpretation leads us to disagree with the taxpayer.

Second, taken literally, the axiom proves too much, because there are few, if any, tax or other statutes that are free from "any ambiguity." It may well be that the axiom's proper application is to cases in which, after the court has engaged in the interpretive process and the arguments are essentially in equipoise—that is, the legislative meaning is nonetheless in doubt—the axiom applies to resolve the case in favor of the taxpayer. In this sense, it would operate as a kind of interpretive tiebreaker. In our view, this is not such a case.

Third, we have generally, albeit not exclusively, applied the axiom to statutes that we have characterized as "tax imposition statute[s]." *Prudential Property & Casualty Ins. Co.* v. *Bannon*, 233 Conn. 243, 248, 658 A.2d 567 (1995); see also *Foodways National, Inc.* v. *Crystal*, 232 Conn. 325, 331, 654 A.2d 1228 (1995); *Altray Co.* v. *Groppo*, 224 Conn. 426, 432, 619 A.2d 443 (1993); *Morton Buildings, Inc.* v. *Bannon*, 222 Conn. 49, 54,

607 A.2d 424 (1992). For instance, the axiom has been applied to resolve ambiguities in the statutory language describing the property or transaction taxed, as applied to the facts of the particular case. See, e.g., *United Illuminating Co.* v. *Groppo*, supra, 220 Conn. 749 (whether generation of electricity constitutes "manufacturing" for purposes of sales tax exemption); *Eastern Connecticut Cable Television, Inc.* v. *Montville*, 180 Conn. 409, 414, 429 A.2d 905 (1980) (whether communications tower was taxable "building" or "machinery" within meaning of General Statutes § 12-64). It is true, as the plaintiff points out, that in *Altray Co.* v. *Groppo*, supra, 435, we applied the axiom to the "right to apportion income under [General Statutes] § 12-218, as in other cases involving the imposition of a tax." Whatever the appropriate reach of, or limits on, this axiom, however, we are persuaded that it should not apply to the provisions of § 12-53 (b) and (c) at issue in the present case.

One of the principal purposes of these provisions is to afford assessors the authority to audit the books and records of taxpayers who may have reported the value of their personal property inaccurately, whether unintentionally or as a result of fraud. These provisions neither describe the property to be taxed, nor the method of valuation. The legislative history indicates that they were enacted to combat the widespread problem of undervaluation that the assessors could not resolve satisfactorily within the limits of their resources and the preexisting time limits. See *Wilcox* v. *Madison*, supra, 103 Conn. 154 (construing tax statute by reference to whether legislature intended to impose difficult administrative burden on assessor). This purpose and this history bring this statute within the guideline that statutes establishing the procedure for the collection of taxes, including statutes enacted to prevent tax frauds, are given a liberal, rather than strict, construc-

tion. 3A J. Sutherland, Statutory Construction (5th Ed. Singer 1992) § 66.06; see *International Business Machines Corp.* v. *Brown,* 167 Conn. 123, 129, 355 A.2d 236 (1974) (use tax, as gap-filling measure, merits liberal construction).

## II

Pursuant to Practice Book § 4140 (c),[25] the plaintiff presents an alternate ground on which to affirm the trial court's judgment, namely, that the assessment was illegal because the assessor did not comply with his mandatory duty pursuant to § 12-53 (c) to give the plaintiff notice. Relying on the principle that "strict compliance with the statutory provisions is a condition precedent to the imposition of a valid tax"; *Empire Estates, Inc.* v. *Stamford,* 147 Conn. 262, 264, 159 A.2d 812 (1960); the plaintiff argues that because the notice required pursuant to subsection (c) of § 12-53 is mandatory, rather than directory, and because, according to the stipulation, the plaintiff received no written notice from the assessor within thirty days after the hearing, the assessment was illegal. The defendants respond that: (1) the plaintiff, by bringing this action, waived any defect arising from the failure of the assessor to give timely notice;[26] and (2) even if there was no waiver,

[25] Practice Book § 4140 provides in relevant part: "Papers to be Filed by Appellant and Appellee . . .

"(c) Any party desiring to present alternative grounds for affirmance, adverse rulings or decisions in the event of a new trial or a claim concerning the relief ordered by the appellate court shall file a statement thereof within fourteen days from the issuance of notice of certification. Parties shall not file other Sec. 4013 papers on a certified appeal without permission of the supreme court."

[26] Because the defendants had stipulated with the plaintiff at the time that they would not claim such a waiver, they do not endorse the trial court's theory that the plaintiff had waived any such defect by filing its appeal with the board of tax review. The defendants nonetheless, in their reply brief, suggest that we are not bound by this reasoning because the trial court relied on that theory of waiver. We reject the trial court's theory of waiver for the same reasons, as explained in the text of this opinion, that we reject the defendants' theory of waiver.

the notice provided for in § 12-53 (c) is directory, not mandatory, and the plaintiff was not prejudiced by the fact that the notice was given, in the first instance, by the tax collector, rather than by the tax assessor. We disagree with the defendants' waiver claim but agree with their contention that the notice under § 12-53 (c) is directory and that there was no prejudice to the plaintiff. We therefore reject this alternate ground for affirmance.

The following additional facts are relevant to this issue. The hearing, or audit, conducted pursuant to § 12-53 (b) terminated on October 12, 1993. On or about October 31, 1993, the *tax collector*, not the assessor, sent three letters to the plaintiff, together with three tax bills.[27] In addition, on January 25, 1994, the *assessor*, in response to an inquiry by the plaintiff, sent the plaintiff a four page schedule detailing the increased assessments on the various categories of the plaintiff's personal property.[28] Section 12-53 (c) provides that "[i]f

---

[27] Each letter was on the letterhead of, and signed by, the New Haven tax collector, and provided as follows:

"DATE: OCTOBER 31, 1993

"RE: PERSONAL PROPERTY AUDIT

TAXES DUE [a specific amount stated]

"DEAR TAXPAYER,

"ENCLOSED YOU WILL FIND AN UPDATED PERSONAL PROP-ERTY TAX BILL FOR THE 1990 GRAND LIST. A RECENT AUDIT BY THE TAX ASSESSOR HAS GENERATED THIS BILL. YOUR CURRENT TAX BAL-ANCE DUE TO THE CITY OF NEW HAVEN IS [same amount as above]. FAILURE ON YOUR PART TO PAY THIS AMOUNT BY NOVEMBER 30, 1993 WILL RESULT WITH THE POSTING OF INTEREST TO THIS ACCOUNT. THIS INTEREST WILL BE CHARGED BACK TO THE ORIGINAL DUE DATE AND WILL BE CALCULATED AT THE RATE OF 18% PER YEAR.

"IF YOU HAVE ANY QUESTIONS REGARDING YOUR AUDIT OR NEW ASSESSMENT CALL BIAGIO FRONTE, DEPUTY ASSESSOR AT 787-8065."

Each tax bill accompanying the letters identified the name and address of the plaintiff, the grand list year as 1990, the fact that the bill was for back taxes due, the amount of the assessment, the total tax thereon, and the due date of November 30, 1993.

[28] On January 25, 1994, the assessor wrote to the plaintiff as follows:

"Dear Taxpayer:

the assessor or board of assessors" increases or decreases the value of any taxable property under the provisions of § 12-53 (b), "they shall, within thirty days of such hearing or any adjournment thereof give [the taxpayer] notice thereof in writing by mailing the same, postage prepaid, to his last-known address and the same shall be held to be sufficient." We turn, first, to the defendants' claim of waiver.

This claim is premised on this court's decision in *Manners* v. *Waterbury*, 86 Conn. 573, 86 A. 14 (1913). In that case, a property owner challenged the assessment of benefits for the layout of a new street on the ground of lack of the legally required notice of the assessment to the property owner. This court held that, by appealing to the court from the assessment, the property owner had waived any defect arising from the lack of prior notice. Id., 578; see also *Palo* v. *Rogers*, 116 Conn. 601, 605, 165 A. 803 (1933) (plaintiff waived lack of required notice by bringing action for injunction and damages in connection with establishment of building line). We seriously doubt whether the waiver principles embodied in *Manners* and *Palo*, which were not tax assessment cases, are still valid, and we conclude, for the reasons that follow, that those principles cannot reasonably be applied to proceedings under § 12-53 (b) and (c).

Section 12-53 (d) specifically provides that "[a]ny person claiming to be aggrieved by the action of the assessor or board of assessors under this section may appeal the doings of the assessor or board of assessors to the board of tax review and the superior court as

"In response to your inquiry, this is to advise that your lists of personal property for the Grand List of October 1, 1990, have been amended, in part, by the City Assessor as shown on Exhibit A attached hereto.

"If you have any questions, call 787-8066."

Exhibit A is the detailed, four page schedule of personal property referred to in the text of this opinion.

otherwise provided in this chapter . . . ." The plaintiff filed such an appeal with the board of tax review and brought this action pursuant to § 12-119. The defendants do not challenge the propriety of this action in any way. It would be strange to hold that a taxpayer waives his right to challenge a purportedly illegal tax assessment by following the procedures specifically provided by the legislature for such a challenge. Moreover, it would, in effect, deprive the taxpayer of any effective remedy for such illegality. We decline to read our statutes, or apply extra-statutory waiver principles, to arrive at such a bizarre result.

We turn, therefore, to the defendants' substantive claim that the assessor's duty of notice under § 12-53 (c) is directory, rather than mandatory. The criteria for determining whether such a notice is mandatory or directory are well established.

"In order to determine whether a statute's provisions are mandatory we have traditionally looked beyond the use of the word shall and examined the statute's essential purpose. [*Hall Manor Owner's Assn.* v. *West Haven*, 212 Conn. 147, 152, 561 A.2d 1373 (1989)]. The test to be applied in determining whether a statute is mandatory or directory is whether the prescribed mode of action is the essence of the thing to be accomplished, or in other words, whether it relates to a matter of substance or a matter of convenience. . . . If it is a matter of substance, the statutory provision is mandatory. If, however, the legislative provision is designed to secure order, system and dispatch in the proceedings, it is generally held to be directory, especially where the requirement is stated in affirmative terms unaccompanied by negative words. . . . *Katz* v. *Commissioner of Revenue Services*, 234 Conn. 614, 617, 662 A.2d 762 (1995). Furthermore, if there is no language that expressly invalidates any action taken after noncompliance with the statutory provisions, the statute should be

construed as directory. Id." (Internal quotation marks omitted.) *Crest Pontiac Cadillac, Inc.* v. *Hadley*, 239 Conn. 437, 446, 685 A.2d 670 (1996). Applying this test, we conclude for the following four reasons that the notice by the assessor under § 12-53 (c) is directory, rather than mandatory, and that its purpose was complied with under the circumstances of this case.

First, although the statute uses the word, "shall," there is no language expressly invalidating a defective notice. Second, the notice provision itself provides that the notice by the assessor within the thirty day period "shall be held to be sufficient." This kind of language is often suggestive of a safe harbor type of notice, rather than a mandatory requirement. See, e.g., *Dart & Bogue Co.* v. *Slosberg*, 202 Conn. 566, 572, 522 A.2d 763 (1987). Third, although the notice triggers the right to appeal to the board of tax review, because the board may or may not be meeting at that particular time, § 12-53 (d) provides that "such appeal shall be extended in time to the next succeeding board of tax review if the statutory period for the meeting of such board has passed." This suggests that time is not necessarily of the essence with regard to this notice. Fourth, because § 12-53 (b) and (c) are the only statutory provisions under which an assessor may recover for fraudulent undervaluing discovered by an audit, we should require a very strong showing of prejudice that an assessor's defective notice under subsection (c) of § 12-53 would preclude such recovery. No such showing has been made in the present case.

The purpose of the notice is "to notify a taxpayer that his property was being assessed at a higher figure than previously," so that, in the absence of such a notice the taxpayer could "rest on the assumption that the valuation of his property continues to be the same" as that at which the taxpayer had listed it. *Empire Estates, Inc.* v. *Stamford*, supra, 147 Conn. 266. In the present

case, the letters from the tax collector, together with the itemized bills, which were sent to the plaintiff within the thirty day period contemplated by § 12-53 (c), gave the plaintiff sufficient information to fulfill the purpose of the statutorily required notice, and this information was supplemented by the further detail given to the plaintiff by the tax assessor pursuant to the plaintiff's subsequent request. Under these circumstances, the plaintiff was not prejudiced in any way by the failure of the assessor strictly to comply with the notice provisions of § 12-53 (c).

The judgment is reversed and the case is remanded (1) with direction to deny the plaintiff's motion for partial summary judgment on counts one and two of the plaintiff's complaint and to grant the defendants' motion for partial summary judgment on those counts, and (2) for further proceedings according to law.

In this opinion BERDON, KATZ and PALMER, Js., concurred.

MCDONALD, J., dissenting. The majority here rewrites General Statutes (Rev. to 1995) § 12-53 (a) and (b) to give the tax assessor three years to revalue personal property listed on a taxpayer list and filed with the assessor. They do so because it is more reasonable, in their opinion, to have a longer period than that found in General Statutes (Rev. to 1995) § 12-55. Section 12-55 *explicitly* gives the assessor the power to decrease or increase the valuation of such property listed but only on the *present* or last preceding grand list.

In doing so, the majority attempts to surmount the plain language of § 12-53 (a) and (b), which restricts those sections to "omitted property" rather than undervalued property, our past decision interpreting those sections as applying only to omitted property; *Wilcox* v. *Madison*, 103 Conn. 149, 154, 130 A. 84 (1925); and the well established rule that ambiguities in taxing stat-

utes are to be resolved in favor of the taxpayer. *Texaco, Inc.* v. *Groppo,* 215 Conn. 134, 137, 574 A.2d 1293 (1990); *Enthone, Inc.* v. *Bannon,* 211 Conn. 655, 661, 560 A.2d 971 (1989); *Pepin* v. *Danbury,* 171 Conn. 74, 83, 368 A.2d 88 (1976); *Consolidated Diesel Electric Corp.* v. *Stamford,* 156 Conn. 33, 36, 238 A.2d 410 (1968).

Believing it has cleared these three hurdles, the majority attempts to bypass the highest one, the punitive nature of § 12-53 (a) and (b), each of which contains a provision that requires a tax assessor to add a penalty of 25 percent to an added valuation. This penalty should have no application to a taxpayer who in good faith has a dispute with the tax collector over the value of its personal property. Such a severe penalty should apply only, as the statute provides, to a taxpayer who omits property on its list in order to avoid taxes or fails to file any list. We have so held. *Northeast Datacom, Inc.* v. *Wallingford,* 212 Conn. 639, 651, 563 A.2d 688 (1989). Every provision for adding property valuation to the taxpayer's list under § 12-53 (a) and (b) mandates such a 25 percent penalty. In 1989, while the statute was in its present form, this court stated that "there is no statutory authority for the levy of a penalty assessment for understating the value of assessable property. . . . General Statutes § 12-53 authorizes a penalty only for property omitted from a list." Id.

The majority concludes, however, by its statutory interpretation that § 12-53 (a) and (b) were also intended to apply to fraudulent undervaluation of property on a grand list. The simple answer to this interpretation is that if the legislature wanted § 12-53 (a) and (b) to apply to cases of fraudulent undervaluation it could have said so. It did not. Furthermore, in the case before us there is no claim or even suggestion that the taxpayer was acting in a fraudulent manner, as the majority recognizes.

The result here is not founded on sound legal principle. Our constitutional warrant is not to rewrite the General Statutes the way we believe they should have been written, but to apply them the way they are in fact written. In the words of Justice Jackson: "I should concur in this result more readily if the Court could reach it by analysis of the statute instead of by psychoanalysis of the Congress. . . . That process seems to me not interpretation of a statute but creation of a statute." *United States* v. *Public Utilities Commission*, 345 U.S. 295, 319, 73 S. Ct. 706, 97 L. Ed. 1020 (1953) (Jackson, J., concurring). It is simply undemocratic for any public officers other than the elected representatives of the people to legislate. It should particularly rankle us, the heirs of revolutionary Connecticut, when this is done to tax us. After all, it was taxation without "our consent" that led the thirteen colonies to take on the British Empire and begin our constitutional system. The Declaration of Independence para. 19 (U.S. 1776).[1] It is vital that we continue that system by recognizing the supreme power of the people and the resultant limitations on our power as a court.

I respectfully dissent.

---

[1] "Taxation without representation is tyranny." Attributed to James Otis (1763). J. Bartlett, Bartlett's Familiar Quotations (16th Ed. 1992) p. 327. "This maxim was the guide and watchword of all the friends of liberty. Otis actually said: No parts of his Magesty's dominions can be taxed without their consent. —Rights of the Colonies [1764], p. 64." Id.